ANNA HESSELMAN

*v.*

AUGUST HAAS et al.

[Decided June 22d, 1906.]

1. The chancellor has general power to superintend the affairs of infants and to provide for their custody.

2. As against any person, except the putative father, the mother of a natural child has the natural right to its custody.

3. For three years after the birth of a natural child the mother maintained it at the home of another woman, when, an abandonment becoming necessary, the mother inserted an advertisement offering the child for adoption, and stating that there would be complete surrender, and that the child might be seen at the home where it was being maintained. It was understood between the mother and the one caring for the child that the mother should be notified if anyone cared to take it. A woman called and took the child, but did not adopt it. The mother was not notified of the taking at the time, and, though she made efforts, she did not discover the child's whereabouts for six years.—*Held*, that the mother had not forfeited her right to custody of the child.

4. On an issue as to whom should be awarded the custody of a child of ten years, the chancellor will not consult the child's predilection.

---

Heard on writ of *habeas corpus*, return thereto, traverse, and proofs in open court.

This is a hearing upon a writ of *habeas corpus* obtained by Anna Hesselman respecting the custody of her child, in which writ the defendants are August Haas and Amaele Haas, his wife.

*Mr. John Wahl Queen,* for the petitioner.

*Mr. Robert Adrain,* for the defendants.

GARRISON, V. C.

The jurisdiction of the court is invoked by this writ of *habeas corpus,* and the pleadings and proofs present an issue as to the right to the permanent custody of an infant, and the matter is therefore before the chancellor under his general power to superintend the affairs of infants and to provide permanently for their custody. *Rossell* v. *Rossell, 64 N. J. Eq. (19 Dick.) 21 (Chancellor Magie, 1902).*

I find the facts as follows: The petitioner is an unmarried woman, twenty-nine years of age. She is employed as a bookkeeper in an advertising agency in New York City, and receives $12 a week. She is a well-appearing woman, in good health, and seemingly of good disposition. Her family are people of some little means, and live in Chicago, Illinois, excepting the sister of the petitioner, who lives with her in New York. Her sister and her mother, who were upon the witness-stand, were each nice looking people, and the impression that they created was favorable. The petitioner and her sister—who is somewhat younger than she, and who is also employed in New York City—live together in an apartment there, and rent rooms therein to two other women, who are also self-supporting. From the location of the apartment, the appearance of the petitioner, and of her sister, mother and the acquaintances whom she called to the witness-stand, I should say that her surroundings were all respectable and proper. In 1895 she was employed in the family of a Mrs. Schultz, in Chicago. She was at that time eighteen years old. She became acquainted with a man who seduced her some time in the month of April, 1895. Shortly after this time Mrs. Schultz removed to New York City, and finding that she was compelled to go abroad, and having two children whom she

desired to have cared for during her absence, sent for the petitioner to come to New York, which the petitioner did some time in the year 1895. She remained in the employment of Mrs. Schultz for some time, and then obtained employment in a restaurant on Twenty-third street, New York City. From there she went to a lying-in hospital, where, on the 2d of January, 1896, she gave birth to a daughter. This is the child the custody of whom is in controversy in this case.

Within ten days after the birth of the child the petitioner was employed as a wet nurse in the family of E. H. Harriman, in New York. Her child was placed with a woman to be taken care of, but was not well taken care of, and was transferred to the custody of a Mrs. Hoffmann. Mrs. Hoffmann was a German woman who for some years was in the employ of the Harriman family, and who, from all accounts, was a thoroughly respectable woman and a proper person to whom to commit the care of the child. An arrangement was made by the petitioner to pay Mrs. Hoffmann $10 a month to care for the child. The child remained with Mrs. Hoffmann for something over three years, when Mrs. Hoffmann informed the petitioner that, owing to the condition of her health, she could no longer care for the child, and the petitioner, not being then in a position to maintain a home herself, or to have the child with her in her then employment, determined to surrender the child for adoption if those applying for it appeared to her as proper persons to whom to confide it. With this end in view the petitioner inserted an advertisement in a German newspaper published in New York City called the "Staats Zeitung." That advertisement, which was inserted on the 28th day of September, 1899, read as follows:

"To adopt—Nice, pretty little girl; brunette; three and a half years; complete surrender. To be seen with Mrs. Hoffmann, Cypress Post-Office, Evergreen, N. Y."

Before inserting the advertisement the petitioner informed Mrs. Hoffmann of her intention to do so, and told her, as she testifies, "the minute anybody came she should let me [the petitioner] know, so that I could speak to them, to see whether they

were worthy of having the child," Mrs. Hoffmann's version of the instructions being that the petitioner said, "When anybody comes and will take the child, then write me at once, so that I could speak to them."

On the morning after this advertisement was inserted, namely, September 29th, 1899, Mrs. Haas, the wife of a baker in Jersey City, went to the home of Mrs. Hoffmann and obtained the child and brought it with her to Jersey City. The conduct of Mrs. Hoffmann in permitting Mrs. Haas to take the child under the circumstances seems unaccountable, unless it was due to her condition of health. She not only did not obey her instructions and notify the mother so that she might interview the people applying for the child, but she did not even obtain the address of the applicant, or learn anything about her condition, surroundings or intentions with respect to the child. It is quite obvious, from her examination in this suit, that she completely lost her head, and allowed Mrs. Haas to take the child without obeying her instructions or doing any of the things which she subsequently realized she should have done under the circumstances. It appears that she did insist that Mrs. Haas should bring back the child at least once a year. I think it clear that there was some talk between these two women, concerning the necessity of the mother's consent, because Mrs. Hoffmann quotes Mrs. Haas as having said that she did not want anything to do with the mother. This could only have been said by Mrs. Haas in response to some suggestion by Mrs. Hoffmann that the former should see the mother concerning the permanent custody of the child.

Mrs. Haas and her husband are hard-working, frugal and worthy people of German extraction. They made a very favorable impression by their appearance and manner. They had lost by death the two children born to them, and were anxious to adopt a child. They saw the advertisement above quoted, and in response to it Mrs. Haas went to the home of Mrs. Hoffmann, as above stated. Their family consists of themselves and a nephew about fourteen years of age. At that time the husband was occupied in running a bakery in the basement of the building in which they lived, and the wife in running a delicatessen

store on the first floor, back of which they had their dwelling apartments. I have no doubt, from the evidence, that their home was in every way a decent and proper place, and such as people of like circumstances customarily have.

The child has not been given much education because of the fact that she could only obtain schooling on half days, but she is a well-appearing child, and looked as if she were well cared for.

At the present time the Haases have neither of them any employment, having sold the bakery business and the delicatessen store. The man testifies that he is looking around now for something to do.

Mrs. Hoffmann, as soon as she had parted with the child, wrote to the petitioner, who was still in the employment of the Harrimans, and the petitioner immediately went to see Mrs. Hoffmann. It is evident, from all of the testimony, that she was much disturbed by the happenings, and was very desirous of locating her child. She immediately set about ascertaining the whereabouts of the people who had taken the child. She searched the directories of New York City, Brooklyn, Jersey City and the adjacent towns, and made inquiries in such directions as she thought would produce the information she sought. Beginning in 1901, when she had more money at her disposal than theretofore, she advertised. The wording of the advertisement was such as to elicit information of the address of the persons who had taken her child. She received no response to any of these advertisements until 1906. In that year she advertised that a reward of $100 would be given by her for information. As a result of this latest advertisement she did obtain information of the dwelling-place of the defendants, and called there and interviewed them. Shortly afterwards this proceeding was commenced.

While it is undoubtedly true that the modern tendency in cases involving the custody of infants is not to give conclusive effect to the legal rights of the claimants for custody, it is nevertheless necessary, since such legal right is undoubtedly a factor for consideration, to determine in this case whether the petitioner has the legal right, or has parted with it to the extent

that, as between herself and the transferee of the right, she may have had power to do so.

Although there is some discussion as to whether, as between the putative father and the mother of an illegitimate child, the latter has a superior right to its custody (*Schoul. Dom. Rel. (5th ed.)* § *278 et seq.*), it is entirely settled that, as against any other than the putative father, the mother of such a child has the natural right to its custody. *Reg.* v. *Nash, 10 Q. B. D. 454; 13 Eng. Rul. Cas. 26,* in the note to which the English and American cases are given; *Friesner* v. *Symonds, 46 N. J. Eq. (1 Dick.) 521* (at *p. 527*) (*Vice-Chancellor Van Fleet, 1890*).

The petitioner, therefore, in this case has the natural right to the custody of this child. But this is a right that she may have lost or forfeited. It is the contention of the defendants that she has forfeited it under the circumstances proven in this case.

There is considerable discussion in the authorities as to contracts or agreements transferring parental rights, but they will undoubtedly be upheld in some cases. *Schoul. Dom. Rel. (5th ed.) 394* § *251 et seq.; Ousset* v. *Euvrard, 52 Atl. Rep. 1110* (*Vice-Chancellor Stevenson, 1902*).

It therefore becomes necessary next to consider whether it can properly be held in this case that the petitioner surrendered or forfeited her right of parental custody of this child.

For three years and a half after the birth of the child she maintained it at the home of Mrs. Hoffmann, paying Mrs. Hoffmann for her services in caring for it. The state of Mrs. Hoffmann's health making a change necessary, and the petitioner not then being able to make a home for the child, she determined to give it up for adoption, completely surrendering all of her parental rights, provided she found people who appeared to her to be worthy to have the child. Her intention is clearly expressed in the advertisement which she inserted. It states that the child is to be adopted, and that the mother will completely surrender it. Undoubtedly, if Mrs. Haas had taken the child with the mother's consent, and had obtained the mother's surrender in such a way as to enable her to adopt the child, it would be extremely difficult, if not impossible, for the petitioner to

regain the custody of the child by any legal proceeding. But this was not the course which the events took. Mrs. Haas took the child without seeing the mother, without anything at all evidencing the mother's consent to her taking it, or anything evidencing a surrender by the mother of her natural right of custody, and Mrs. Haas did not adopt the child.

It will be observed that the advertisement does not suggest that Mrs. Hoffmann was anything more than the custodian of the child, at whose house the same could be seen. There was nothing in the advertisement to lead one to the conclusion that Mrs. Hoffmann had authority to act on behalf of the mother as to surrendering or as to transferring the custody of the child.

Under these circumstances I do not think it can properly be held that Mrs. Haas acquired any rights as against the petitioner. She, so to speak, took her chances. She was informed by the advertisement that the child was for adoption, and that the mother would completely surrender. She must be presumed to know that she could only obtain such surrender by some communication, at least verbal if not written, from the mother; and there would seem also equally to rest upon her the obligation, if she obtained the child, that she would adopt it. It is hardly to be conceived that the mother intended to completely surrender all her own rights without seeing to it that the child acquired rights as against the person who took it.

The petitioner has never shown the slightest neglect of her child, or carelessness concerning its welfare. It is true that for several years she did not see the child, but that was through no fault of her own. Up to the time that Mrs. Haas took it, the attitude of the mother toward the child was entirely commendable, and she is, of course, not to be charged with neglect, or with any lack of feeling or proper conduct toward the child during the period that she did not know or had no means of knowing or ascertaining where it was.

I conclude that Mrs. Haas did not acquire any right by reason of the facts proven in this suit.

The modern tendency of the courts in these matters of custody is so permeated with determination to do that which will best serve the interests of the infant that, notwithstanding the

presence of a legal right upon one side and a lesser right of the same nature, or the entire absence of any legal right upon the other, it is necessary to determine whether the granting of custody to the one having the legal right will be prejudicial to the welfare of the infant. If, in this suit, after I have reached the conclusion above stated that the petitioner has the natural right of custody, and has not forfeited it, and that the defendants have not therefore any legal right, I concluded that the petitioner was an unfit person to have custody of the child, I should feel constrained by the authorities to refuse to grant her its custody.

But I do not find such to be the fact. I need not reiterate that which I have heretofore said concerning the petitioner. I need only state that my finding is that she is a fit and proper person. Under such circumstances, the mother having the natural right, and not being shown to be unfit, will be awarded the custody. *Giffen* v. *Gascoigne*, 60 *N. J. Eq.* (15 *Dick.*) 256 (*Vice-Chancellor Grey, 1900*); *Reg.* v. *Nash, supra;* *Mayne* v. *Baldwin,* 5 *N. J. Eq.* (1 *Hal. Ch.*) 454 (*Chancellor Halsted, 1846*). In this last-cited case the chancellor awarded the custody to the father, although he had verbally committed the child to the defendant to be kept and adopted until it arrived at full age. *Baird* v. *Baird,* 18 *N. J. Eq.* (3 *C. E. Gr.*) 194 (at *p. 198*) (*Chancellor Zabriskie, 1867*).

The child is now ten years of age. I have not consulted its predilection. I feel that Sir George Jessel properly expressed the attitude of a court of equity concerning a child of this age. He said: "I have never consulted so young a child, and it has not been the practice of courts of equity to do so." *Reg.* v. *Nash, supra;* *Schoul. Dom. Rel.* (5th ed.) § 250.

So that no injury may ensue to the defendants, I assume, for the purposes of this case, that the child, if consulted, would express her preference to remain with them. The defendants undoubtedly believe that they are acting for the best interests of the child. But, as was said by Lord-Justice Bowen, in *Reg.* v. *Nash, supra,* "Philanthropy sometimes makes mistakes. * * * The question is whether, in considering what is for the benefit of the child, the court will have regard to natural relationship."

Having regard to the natural relationship between this child and the petitioner, and the fact that she is not shown to be an unfit person, but is affirmatively shown to be a fit person to have custody of it, I will award it to the petitioner.