JESSIE A. WOOD, appellant,

*v.*

MARY WOOD, respondent.

[Argued June 23d, 1910. Decided July 5th, 1910.]

On appeal from a decree of the prerogative court advised by Vice-Ordinary Walker.

*Mr. Alfred F. Stevens,* for the appellant.

*Mr. Frank E. Bradner,* for the respondent.

PER CURIAM.

Jessie A. Wood, the appellant, presented to the orphans court of the county of Essex a petition praying that she be authorized to adopt her minor niece, Loretta Wood, pursuant to the provisions of "An act concerning minors, their adoption, custody and maintenance" (*P. L. 1902 p. 259*), as amended in 1905 (*P. L. 1905 p. 272*). The application was resisted by the mother of the child, the present respondent, and, after a full hearing, the prayer of the appellant's petition was granted and a decree of adoption made. From this decree the mother appealed to the prerogative court, and that court, after hearing, reversed the decree of the orphans court. The present appeal is from the decree of reversal.

Our examination of the case satisfies us that the conclusion reached by the Essex orphans court was entirely justified by the proofs submitted and for the reasons set out in the following opinion of Mr. Justice Ten Eyck, filed in that court:

"Loretta Wood, a child now twelve years old, is the niece of the petitioner, being the child of her brother Robert Wood.

"Until 1902 all the parties lived in Summit. The petitioner and her sister then moved to Newark and have since lived there,

38

the sister (Mary Wood) having a position as forewoman in a shirt factory and the petitioner keeping house and assisting in the work brought home from the factory by her sister. Together they make from twelve to fourteen dollars per week. They are apparently people of refinement and have a comfortable home. Before they came to Newark, in 1902, they had always bought Loretta clothes and were very fond of her, she staying with them in the daytime and going home at night. When they moved to Newark their brother brought Loretta down and asked them to take her and bring her up and have her educated. The aunts testified that he then said his wife wouldn't look after her properly, and that the mother often said, 'You can do better by her than I can.' At that time he had two other smaller children. Loretta was then six years old. She occasionally visited her parents, but thereafter lived with her aunts. Afterwards two other children were born to her parents. Loretta's mother never made any objection to her staying with her aunts and seemed to be satisfied with the arrangement. In December, 1905, the father died, leaving his widow nothing except about five hundred dollars insurance. She kept a boarding-house about six months, and since then has supported the family by working out at laundry and other work, making ten or twelve dollars a week. The two youngest children she put in the Fresh Air home, as she was obliged to be away all day; the two next younger than Loretta went to school and had to look after themselves, got their own lunch and do what they could of the housework. Soon after the father's death Miss Mary Wood was at Summit and said to a Mrs. Ross, who lived in the same house with Mrs. Wood (Loretta's mother), that she hoped Mrs. Wood would not take Loretta away from them. Mrs. Ross reported this to Mrs. Wood, who came and told Miss Mary Wood that she need not be afraid, that she would never take her 'because you can do better by her than I can.' The mother admits that Mrs. Ross told her about Mary Wood speaking to her, but denies that she then said anything about it to Mary Wood; she says that she did say to Mrs. Ross, 'I didn't have any intention of taking her *just yet.*'

"The mother continued to allow Loretta to stay with her aunts, making no objection until June, 1908, when she wrote, saying

she wanted her and her sister Lucy (who was also then with the aunts) to come back to her. The only reason she gives for making this change is that Bertie (the next oldest child) had had to 'rough it,' she thought Loretta ought to do the same. She says the reason why she allowed her to remain was because she knew the aunts were fond of her and she didn't want to hurt their feelings. She says she always had objected to Loretta's going to her aunts to live, from the first, but admits she never made any objection, because she wanted to keep peace in the family and knew she would have her say some day.

"After the father's death, the third eldest child, Lucy, was also ·taken by these two aunts and kept about two and a half years, a third aunt paying her expenses for board and clothes; the second eldest, Bertie, then being the only one remaining with the mother, the two youngest being in the Fresh Air home.

"The aunts made no objection to Lucy's going back, but wished to keep Loretta. They told the mother if she insisted on taking her, that they would charge board at $3 a week for the six years. They said they did this only because they thought it would induce the mother to leave her with them, as they knew she had no money.

"In November the mother went, with another woman, to the public school and when Loretta came out the mother, by advice of her counsel, took her and compelled her to go with her. The child cried and objected. She asked to be allowed to ·tell her aunts, but the mother refused, saying, 'They didn't consider me, why should I consider them?' Loretta· threatened to tell the school principal, but was not given the opportunity to do so. Her school companions followed them to the railroad station.

"The mother wrote the aunts, and Miss Jessie had a talk with her in Newark and afterwards in Summit. Mrs. Wood told her that she had taken the children home to bring them up as Catholics; that they had been bringing Loretta up to look down on her, and that she must, rough it like the others. The aunt offered to have her confirmed in Newark and bring her up as Catholic, but she refused. The aunt had seen a priest in Newark and he had said he would speak to the priest in Summit about it.

"Miss Mary Wood soon after went to Summit. Mrs. Wood refused to let her see Loretta at home. She saw her at the parochial school. She says Loretta seemed afraid to speak to her and looked ill and poorly cared for.

"The children's ages now with Mrs. Wood are—Loretta twelve, Bertie ten, Lucy seven.

"Under the facts brought out at the hearing, some of which are shortly stated above, I am satisfied that Loretta was, at the age of six, placed by the father, with the mother's consent, in the care of her aunts, with the intention of having her brought up and educated by them. No objection to her schooling or on religious grounds was ever made by the mother. She had a good home, loved her aunts and was loved by them. She attended the public schools in Newark and was brought up in a much better condition of life than was within the power of her parents to afford. They had a large family of small children, and it was no doubt a hard strain on them to look after and bring them up properly. The aunts had always provided Loretta's clothes, even before they took her, and she had spent much of her time with them while they lived in Summit. She evidently was entirely happy and contented with them. She said she would not go back to her mother and threatened to run away if she took her back. I do not believe the evidence of the child, after she had been several months in her mother's care, that her aunts ever tried to poison her mind against her mother. I believe the real state of the child's mind was shown by her crying and objection to going when her mother took her away by force. The aunts impressed me as people of truthfulness and of unusual refinement and cultivation for their station in life, and no doubt are as fond of Loretta as they could be if she were their own child. The conduct of her father and mother during all the time she was there, and of the mother after the father's death, showed their confidence in the aunts and belief that it was for Loretta's welfare to remain there. The only reason why Mrs. Wood wanted to take her away evidently was to make some use of her and to have her 'rough it' at home with her younger sisters. Not for Loretta's benefit, but to keep her down to the level with the others. So far as the religious aspect is concerned, while the

mother knew for years that Loretta attended the Presbyterian Sunday-school, she never made any objection to the aunts or even requested that any change be made. She has no right to break the ties which she thus allowed to be formed, for practically all of the child's life, and forcibly transfer her into a different atmosphere and surroundings, for any reason she gives, unless it may be considered that as her mother she still has that absolute right. Considering the child's interest alone, there is no question in my mind that it requires that she should be kept by her aunts. Loretta now says she prefers to be with her mother and sisters because she has more fun and learns more. Both the substance and manner of her testimony convince me that she is not truthful at the present time. She is a very attractive child, but apparently easily moulded, and, in my judgment, does not now make a true and frank statement of her own feelings and wishes. Up to the very time when she was taken by force, crying, from school, by her mother, she always wished to stay with her aunts, and never wanted to go home. Her surroundings at the aunt's home are, in my judgment, much more calculated to result in her proper bringing up, education, maintenance, cultivation and everything that goes to make a woman of character, than in her mother's home. Nothing can be said against Mrs. Wood's character or reputation, but the case is full of evidence that if the child's good is to be considered, the status created in all these years should not be changed for any reasons given by the mother and could not be without serious injury to the child's welfare.

"As to the objection that there can be no decree of adoption without the mother's consent, I think the facts bring the case within the rule laid down in the case of *Winans* v. *Luppie, 47 N. J. Eq.* (*2 Dick.*) *302.* While there has been no actual abandonment, there has been, in my opinion, such a course of conduct on the part of both the father and mother as to indicate that there was a settled intention to forego parental rights and to leave the child permanently in the care of her aunts, for the reason that it was considered by both parents to be for the child's good. The mother should not now be allowed to reassert her rights to the child's detriment."

In view of the statement contained in the opinion of the vice-ordinary, that it seems to be conceded in the opinion of the orphans court that there had been no abandonment of her daughter by the respondent, we deem it proper to say that we do not so understand the opinion of the orphans court. The statement contained in it that "there has been no actual abandonment" is explained by what immediately follows it, and as we read it the conclusion expressed is that while there has been no actual abandonment, *i. e.,* desertion, of the child by its mother, there has been such conduct on the part of the mother as amounts to an abandonment within the meaning of that word as used in the statute.

The decree of the prerogative court will be reversed.

*For affirmance*—None.

*For reversal*—The Chief-Justice, Garrison, Swayze, Trenchard, Parker, Bergen, Voorhees, Minturn, Vredenburgh, Vroom, Gray, Dill, Congdon—13.