This is a proceeding founded upon a writ of habeas corpus by a natural mother, a young woman twenty-nine years of age, against the state board of children's guardians.
The petitioner and her family emigrated from Italy upon the invitation of one Vanterini and his wife, and appear to have lived with the latter, down to the time of the happenings out of which this suit grows. During the night of the 1st of February, 1922, the petitioner, who was and still is unmarried, gave birth to the child for whose custody she now asks. She was unattended by anyone, and appears to have actually delivered herself before her father learned of her condition or the birth. He was greatly excited thereby and called in the wife of Vanterini, who was his landlady and resided in an upper floor of the same building, and sought her assistance. Subsequently, on the same night, or early the following morning, a third party, a man named Tamburelli, was taken into the secret, and, as a result of the deliberation of these three, they prevailed upon her to have the baby placed in a home devoted to the care of children in their neighborhood. Due to a rule of such places, the admission of so young a child was refused, and thereupon the petitioner's father, Mrs. Vanterini and Tamburelli secured a taxicab and drove to West Hoboken to the home of another member of the family. From this place the petitioner's father and Tamburelli took the child, leaving the Vanterini woman for the time being, and went to an apartment-house in the same town, where they abandoned the child in the doorway.
Proceedings were thereupon taken under the act, and the child was committed to the almshouse of Hudson county, where it was subsequently claimed by the respondent, and, *Page 256 
eventually, placed by it in the home of a man and his wife in the city of Bayonne to be cared for. In the following summer the petitioner, her father, Tamburelli and Mrs. Vanterini were apprehended and indicted for conspiracy, and, subsequently, each pleaded non vult thereto. More than six months elapsed between the time of the disappearance of the child and the arrest of the petitioner, during all of which time no efficient effort was made by her, or anyone upon her behalf, to learn of the whereabouts of her child. Repeatedly upon the witness-stand, both in the original hearing and afterwards in the rehearing, I called upon this young woman to explain why she did not complain to the police or seek the services of a lawyer, and she attempted to excuse her inactivity behind an allegation of ignorance. I also repeatedly asked her father why he did not take steps to learn what had become of the child, and he pretended that he had sent his son to find out from Tamburelli where the baby was, although he knew and admitted that he was present when the child was abandoned, as I have described. It is, of course, incredible that this man, no matter how ignorant he may be, could have supposed that Tamburelli was acting properly when, in the dead of night and in the winter time, he left this infant upon a doorstep.
Assuming that this woman's story is true, and that she did not know her child was being abandoned, it is impossible for me to escape holding that her father certainly did know what he was doing. She still lives with him in the home that he dominates and which is shared by one of her brothers, and will have to remain therein. She is unmarried, without means to support herself, and, of course, would be doubly handicapped should she move away to live where she would have to devote her time to making a living and the care of this two-year-old boy. I feel that it would be a perilous thing for the child's welfare to take it from its present custodians and return it to the influence and power of its grandfather. The people with whom the child now lives are industrious Polish people. The wife, although married many years, is without children, and is lavishing upon this baby *Page 257 
the wealth of affection that she would have bestowed upon her own children if she could have had them. She is a quiet, well-appearing young woman, who seems to have given the best of care to the little boy. Her husband is employed by one of the large corporations doing business in Bayonne, at wages of $38 a week, and has been employed by the same company for many years, and seems to be quite as attached to the child as is his wife.
At this late day, it is the well-established policy of courts of equity to give paramount consideration to the welfare of the child under such circumstances as are developed in this proceedings. In the leading case of Richards v. Collins,45 N.J. Eq. 283, the court of errors and appeals say:
"In a controversy over its [a child's] possession, its welfare will be the paramount consideration in controlling the discretion of the court. The strict right of the parent will be passed by, if a judgment in observance of such right would substitute a worse for a better custodian."
It might be said, in passing, that in the case just quoted much stress was laid by the court upon the fact that the infant in that case, as in this, had grown up without any association with the household and family of its parents. In the instant case, this child has been among strangers since the day of its birth. In the able and earnest brief filed by the petitioner's solicitor, stress is laid upon Hasselman v. Haas, 71 N.J. Eq. 689;Ex parte Hoines, 112 Atl. Rep. 613, and Ex parte Judge,91 N.J. Eq. 395. I do not feel that these decisions should influence my judgment in favor of the petitioner, for the reason that they all present different facts. In these cases there was nothing to choose, so far as the welfare of the child was concerned, between the parent seeking a return of his child and the respondent in whose custody it then was. The opinions of Vice-Chancellor Garrison, Vice-Chancellor Stevenson and Vice-Chancellor Backes, respectively, stress the fact that proper conditions would surround the infant if his custody was again given to its parents. In the case sub judice, on the contrary, while I have nothing to say against the petitioner, I believe that, on *Page 258 
past performances, I would be gambling with this little boy's future should I place him within the reach of the grandfather, who has once attempted to make away with him, and whose sense of shame and hostility to the boy must be quite as keen to-day as at the time the baby was born.
I feel that I am sustained in my present determination by the opinion of Mr. Justice Minturn, in Fischer v. Meader,95 N.J. Law 59. The circumstances of that case and the instant one are very close, if not parallel, excepting that in the case in hand my fear of the consequences to the child grows, not from the character of the petitioner, but, as I have said, from the character of her father, as it has been portrayed. Were it not for his influence and the danger that radiates from him, a different situation might exist, and I might say as between the equal qualification of the mother and the present custodian the legal right of the former would prevail, in analogy to the equitable maxim.
 ADDITIONAL OPINION FILED MAY 6TH, 1924.
After having prepared the foregoing, and just before I would have filed the same, I was waited upon by the petitioner and a Mrs. Graf, who is distantly related to her by marriage. The latter is a matronly and very intelligent woman who is married and lives with her husband and one adopted child, she having no children of her own. She resides, I am informed, in a house containing only her own family, in the suburbs, and I have no doubt that her home is an eminently proper one for any child to occupy. There have been two hearings on the petition in this case, and I learn from these women that the petitioner had grasped the fact that my disinclination to grant her prayer was not caused by any feeling against her, but only because of the danger to the child I apprehended would result from again throwing him within the baneful influences of his grandfather. This young woman has, for several months past, taken up her residence with Mrs. Graf, and assures me that she will perpetually maintain her child away from the home *Page 259 
of her father if again entrusted with his care and custody. She has secured employment, so that she is now in a position of affluence for one of her circumstances, offers to reimburse the present foster parents of her son, and Mrs. Graff agrees that she will attend to the wants of the little boy while his mother is engaged in her employment. This, of course, places an entirely different light on the situation, and brings the matter within what I had to say in differentiation of this case from those ofHasselman v. Haas, Ex parte Hoines, Ex parte Judge andFischer v. Meader, supra. If, furthermore, her expression of intention is made bona fide, it contains the strongest proof of the overweening love and affection of this young woman for her offspring. She has been willing to sever and uproot all the ties and tendrils of her entire life to secure the return to her of her child, and manifests an exhibition of devotion that I am unable to withstand, not as a matter of sentiment, but as evidence of her character and the propriety of giving her an opportunity to rear her son, which is a right any court interferes with only in the extremest cases.
However, protestations of intention are so easily made, and promises so frequently broken, that I do not purpose gambling, as I have before intimated, with the infant's safety. The respondent, through its superintendent, has made a suggestion which, I think, solves my difficulty. It agrees that if the custody of this boy be not disturbed it will place him with the petitioner, there to remain so long, and only so long, as she gives him proper care in proper surroundings. Therefore, I will advise an order in accordance with the plan I have just outlined, and any future application that may be appropriate to carry such a solution of the difficulty into effect may be made. *Page 260