By this petition the petitioner seeks the custody of Joseph Hayes Wiener, an infant twelve years of age, and appointment as guardian of his person and property. Upon the return of an order to show cause advised on the filing of this petition, counsel for the defendants moved to dismiss the petition on the ground that upon its face it exhibited no cause of action. Later, the defendants answered and the motion was held until final hearing, which has now been completed. This controversy arises out of the following facts:
Joseph Hayes Wiener, the infant whose custody and guardianship are the subjects of this controversy, was born on July 29th, 1929. His father was Dr. Joseph Wiener, a distinguished heart specialist, who, with his wife, K. Hazel Dowling Wiener, the mother of the infant, resided at Deal and Allenhurst, Monmouth County, New Jersey. Mrs. Wiener, the natural mother of the child, died within a week after its birth. On September 27th, 1930, Dr. Wiener married the petitioner and she, on October 19th, 1933, formally adopted this motherless child pursuant to proceedings in the Monmouth County Orphans Court, the decree of adoption bearing the last mentioned date. On January 27th, 1936, Dr. Wiener and the petitioner, his then wife, entered into a separation agreement, one of the provisions of which was that the custody of "Joseph H.D. Wiener, infant son of the party of the first part by a former marriage," was committed to Dr. Wiener. The petitioner then went to California, and later to Nevada, where, on April 10th, 1936, she obtained a decree of divorce from Dr. Wiener. The following year she remarried and moved to Arizona, and later to California, where she now resides. For a period of nearly five years after her separation from Dr. Wiener, from January, 1936, to December, 1940, she never saw this child and had no contact with him. During the Christmas holidays of 1940 and again during the summer of 1941, the child visited her in California. There was some intermittent correspondence between the petitioner and child during 1941, but she did not see him again until after Dr. Wiener's death. After the divorce Dr. *Page 67 
Wiener also remarried, and was later again divorced. He died on September 8th, 1941, a resident of Monmouth County, unmarried and leaving as his only child, his infant son, Joseph Hayes Wiener. The decedent, by his will dated September 28th, 1938, named his son as sole beneficiary and appointed the defendants Emmet V. Hall and Alma Hall executor and executrix thereof and guardians of his infant son. The will has been duly probated and these defendants have duly qualified as executor and executrix thereof and as guardians of the infant. Dr. Wiener's estate is substantial and his life was insured for more than $100,000, all of the policies naming his son as beneficiary.
The petitioner bases her claim of right to custody and guardianship of the child upon the decree of adoption above referred to and asserts that by virtue thereof she became vested with all the rights of a natural mother of the child, and that Dr. Wiener's appointment of a testamentary guardian of his son is void and of no effect because such appointment was not consented to in writing as required by the statute, R.S. 3:7-15. On the other hand, the Hall defendants, testamentary guardians, while admitting that petitioner did not consent to such appointment, claim that the appointment was valid and effective and that the statutory requirement of consent applies only to a surviving natural parent and not to a surviving adoptive parent; that the word "parent" as used in R.S. 3:7 and R.S. 9:3 means a natural father or mother and not an artificial or adoptive father or mother created by law. Also; that by the provisions of the separation agreement whereby the custody of the child was committed to Dr. Wiener, and by reason of her actual abandonment of the child since the date thereof, and by her divorce from Dr. Wiener, the petitioner has forfeited all rights acquired by the adoption decree. The issues thus raised require a construction of the pertinent statutes and a discussion of or reference to some of the decisions of our courts touching the adoption, custody and guardianship of infants. The statutes to be considered are R.S.9:3, R.S. 3:7, R.S. 9:2 and their antecedents. They will be discussed in the order stated. *Page 68 
 I. Adoption.
Adoption was unknown to the common law and is purely statutory.In re Book's Will, 89 N.J. Eq. 509 (reversed on other grounds,90 N.J. Eq. 549); Elmer v. Wellbrook, 110 N.J. Eq. 15.
Statutes authorizing adoption of children, being in derogation of the common law, are to be strictly construed. Ibid. Our Adoption Statute is R.S. 9:3-1 to 9:3-11, and as applied to this controversy is essentially the same as that in force at the date of the adoption decree here involved. Sections 1 and 2 of that statute provide the qualifications of an adopting parent.R.S. 9:3-4 contains the requirements for consents to adoption, but only subdivision "c" of that section need be here considered. Under the circumstances therein mentioned the consent of but one parent is required. The pertinent language is as follows:
"One parent if the other is dead, unknown or mentally incompetent, or has forsaken parental obligations or been divorced from the father or mother of the child because of his or her adultery or desertion or extreme cruelty." (Italics mine.)
Section 7 provides for a decree of adoption "declaring and adjudging that, from the date of such decree, the rights, duties, privileges and relations theretofore existing between the child and his parent or parents shall be in all respects at an end, excepting the right of inheritance; and that the rights, duties, privileges and relations between the child and his parent orparents by adoption shall thenceforth, in all respects, be the same, including the right of inheritance, as if the child had been born to such adopted parent or parents in lawful wedlock,except only as otherwise provided in this chapter." (Italics mine.)
As to the intent of the legislature in using this language, this court, in In re Book's Will, supra, said:
"The legislature intended to permit the creation of an artificial status which would have so many of the incidents of the natural status of parent and child as indicated by the act, but it does not follow from this that it was the legislature's *Page 69 intent, because it attached to the artificial status most of the attributes which attach to the natural status, to create astatus which, aside from the exceptions specifically provided for by the act, should be in all respects equal to the naturalstatus." (Italics mine.)
The decision of this court in that case was reversed by the Court of Errors and Appeals (90 N.J. Eq. 549), but this statement was not criticised in any way.
Counsel for the petitioner cites Rosier v. Fischer, 2 N.J.Mis. R. 499, and claims that it is dispositive of the issues here, but it is not. There the petitioner had adopted the child of her husband by a former marriage. The father died and his widow sought the custody of her adopted child. Counsel quotes from Vice-Chancellor Leaming's opinion as follows:
"The general effect of adoption is the creation of a relation between the adoptive parent and the adopted child, which is essentially the same as that of a natural parent and child. The duty of obedience of the child and the obligation of control and support imposed upon the adoptive parent are precisely the same as like duties and obligations arising from the natural relation."
"It follows that it is the strict legal right of petitioner to enjoy the custody of her adopted child."
But Vice-Chancellor Leaming also said, "But this right cannot be enforced by the courts in all circumstances." And the petition was dismissed for reasons touching the child's welfare, which was held to be the "paramount consideration."
Notwithstanding the quoted statement that the artificial statutory status "is essentially the same as that of a natural parent and child," there are in the statute definite limitations, either express or implied, upon the rights, duties and obligations incident to the artificial status. Had the legislature intended to vest in the adopting parent rights co-extensive with those of a natural parent, there would have been no purpose in using the words "except only as otherwise provided in this chapter" as the closing words of section 7 of the statute. Some of the exceptions thus referred to are contained in section 9 of the statute. The ordinary or usual adoption contemplated by the statute is the adoption by persons *Page 70 
referred to and whose qualifications are prescribed in sections 1 and 2 of the act. But a totally different kind of adoption, viz.: adoption by one who has become a stepfather or a stepmother of the child intended to be adopted, is provided for in the last paragraph of section 9, which reads as follows:
"Where a parent who has procured a divorce or a survivingparent, having lawful custody of a child, lawfully marriesagain, or where an adult unmarried person who has become a foster parent and has lawful custody of a child marries, andsuch parent or foster parent consents that the person who thusbecomes the stepfather or the stepmother of such child may adoptsuch child, such parent or such foster parent so consentingshall not thereby be relieved of any of his or her parental duties toward or be deprived of any of his or her rights oversuch child, or to his property by descent or succession." (Italics mine.)
The italicized portion of that paragraph, read alone, obviously applies to the adoption of Dr. Wiener's infant son by the petitioner. By that adoption the natural father surrendered none of his rights and escaped none of his obligations. But in the ordinary case of adoption the natural parents are "divested of all legal rights." In cases coming under the provisions of this paragraph the surviving parent is not "deprived of any of his or her rights." As amended in 1939 (P.L. 1939 ch. 355 p. 861) this section now reads as follows:
"Where a parent who has procured a divorce or a surviving parent, having lawful custody of a child, lawfully marries again, or where an adult unmarried person marries after having securedthe lawful custody of a child through adoption, and such parentor parents by adoption consents that the person who thus becomes the stepfather or the stepmother of such child may adopt such child, such parent or such parent by adoption so consenting shall not thereby be relieved of any of his or her parental duties toward, or be deprived of any of his or her rights over such child, or to his property by descent or succession.
"Nothing in this act contained shall affect any rights, duties or obligations created by adoptions heretofore affected." (Italics mine.)
The changes in the language of this section accomplished by this amendment are indicated by italics and will be hereinafter discussed. *Page 71 
It should be noted that all through the act (R.S. 9:3) the legislature used language clearly distinguishing between a natural parent and an adopting parent. In section 2 the words "adopting parent" are used to designate the person applying for adoption, while in section 3 the words "parents" or "living parents" are used to designate the natural parents of the child. Likewise in section 4 the words "parent" and "parents" are used to designate the natural father and mother. In section 6 the words "adopting parents" obviously refer to the petitioners for adoption. And in section 7 the words "parent or parents" are used to designate the natural father or mother, and the words "parent or parents by adoption" and "adopted parent or parents" are used to designate the statutory father or mother. In section 8, subdivision "c," the terms "adopting parent or parents" and "natural parent or parents" are used to distinguish between the two classes of parents. Again, in section 9 the words "parents of the child" are used in referring to the natural parent or parents, while the terms "adopting parent or parents," "adopted parent or parents," and "adopting deceased parent or parents" are used when referring to the artificial or statutory parent or parents. So, in section 10, the words "adopting parent or parents" refer to the statutory parent. In short, all through the statute a clear distinction between a natural parent and an adopting parent is made, and it cannot be assumed that this distinction was purposeless. One purpose of the distinguishing terms appears, I think, when we read the last paragraph of section 9 of the statute, which is quoted above. That paragraph was intended to protect all the personal and property rights of the natural parent who consented to the adoption of his or her natural child by a step-parent. In my judgment, it admits of no argument that when the legislature intended to refer to the statutory parent it did so by the terms "adopted parent," "adoptive parent" or "parent by adoption," or the like; but wherever the natural parent is referred to only the words "parent" or "parents" are used without the qualifying or descriptive adjective "adopted" or "adoptive" or the like. It follows that when the words "parent" and "surviving parent" were used by the legislature in the last paragraph *Page 72 
of section 9 without the qualifying or descriptive adjective, it intended to refer to the natural parent.
Helpful, also, to an understanding of the intention of the legislature in using the terms "parent," "adoptive parent," "surviving parent," and the like, is the latest amendment toR.S. 9:3-9 (P.L. 1939 ch. 355 p. 861), cited and quoted above. A comparison of this amendment with the original section 9 in the Revised Statutes shows a substitution of the words "parent by adoption" for "foster parent," and this change in the language clarifies the meaning of the words previously used and emphasizes the legislative distinction between a natural parent and a statutory parent. By the use of similar terms, this distinction has also been recognized by the courts. In re McEwan's Estate,128 N.J. Eq. 140; Jackson v. Beal, 127 N.J. Eq. 156; Elmer v.Wellbrook, supra. In my judgment, the words "surviving parent" as used in this paragraph refer to a surviving natural father or mother, and I so hold.
In Webster's International Dictionary (second edition) the word "parent" is defined as "one who begets, or brings forth, offspring; a father or a mother." To paraphrase Backes, V.C., inDulfon v. Keasbey, 111 N.J. Eq. 223, 228, the word "parent" standing alone, or the words "surviving parent" as used in the statute means the parent who begat the child "as in Genesis," from whose loins the child came and not parents artificially created by law.
In re Alter, 92 N.J. Eq. 415; Smallwood v. Smallwood,121 N.J. Eq. 126; In re McEwan, supra; Rosier v. Fischer, supra, and other cases cited by counsel for the petitioner in support of the contention that the petitioner as the adoptive mother of the infant "became to all intents and purposes the natural mother," are not in point, as all, with the exception of Rosier v.Fischer, supra, had to do with property rights, and the language of the courts used in deciding those cases must be considered in the light of that fact. For instance, in the Court of Errors and Appeals opinion in In Re Book, supra, the court said that the effect of the statutes therein referred to was to place adopted children "in the same position as if they had been natural born children of the decedent, *Page 73 
so far as those statutes are concerned;" but only property rights and not rights of custody were involved in that case. In Rosier
v. Fischer, supra, while the right of custody by an adopting stepmother was involved, there was no conflicting right of a testamentary guardian to be considered, and notwithstanding Vice-Chancellor Leaming's statement that it was the strict legal right of the petitioner to have the custody of her adopted child, he refused to award such custody to her for reasons which he considered sufficient to warrant the dismissal of the petition.
 II. Appointment of Testamentary Guardian.
Having determined the meaning of the words "surviving parent" as used in the last paragraph of section 9 of the Act Concerning Adoption we may now proceed to the question touching the right of Dr. Wiener to appoint a testamentary guardian for his infant child.
In In re Book, supra, Chief-Justice Gummere, speaking for the Court of Errors and Appeals, said:
"It is a universally recognized rule of statutory construction that where there are different statutes in pari materia, though made at different times, and not referring to each other, they shall be taken and construed together as one system, and as explanatory of each other."
In that case, for the purpose of determining the property rights of the adopted child, the court considered and construed together the Act Concerning Wills, the Statute of Descent and the Statute of Distribution. So here, in order to determine the rights of an adoptive parent, we must consider not only the act concerning adoption (R.S. 9:3), but also the act relating to appointment of fiduciaries, including testamentary guardians (R.S. 3:7) and the act concerning the care, custody, guardianship and support of children in general (R.S. 9:2), all of which are related. We have already discussed the provisions ofR.S. 9:3. R.S. 3:7 will now be considered. *Page 74 
The right of a father to appoint a testamentary guardian for his infant child has existed in England since 1672. It was there conferred by Statute 12 Charles II, ch. 24 ¶ 8. In In re VanHouten (1835), 3 N.J. Eq. 220, Chancellor Vroom said (at p.226):
"The father, while living, is the natural guardian and protector of his child; and he cannot be divested of the privilege, except under extraordinary circumstances. The Statute of Car. 2nd conferred on the father a power to appoint testamentary guardians, and the same right exists in this state under an act of the legislature. Where such guardians are appointed, they stand in loco parentis, and supersede those appointed by the Orphans Court.
"In case of the father's death, the mother succeeds to him as guardian by nature; but when a testamentary guardian is constituted by the father, the natural right of the mother must yield to the will of the father. It is paramount, and is considered a continuation of the father's authority. To take away from the mother this natural privilege, the father's intention should be manifest. The words are not important, for the intention will govern."
The statutory right of the father to appoint a testamentary guardian of his infant child has existed in New Jersey since 1795, at the latest. See "An Act Concerning Wills," section X,Paterson's Laws 189, 192. This right and power in the father was continued by the Wills Act throughout the various revisions until the Revision of 1874. In the Revision of 1821, at page 277, it still appears as section 10 of the Wills Act; but in the Revision of April 15th, 1846, it became section 9 of that act. (See R.S. 1847 p. 366.) In the Revision of 1874 that section was eliminated from the Wills Act and its provisions were incorporated in "An Act Relative to Guardians and The Estates of Minors," approved March 27th, 1874. See Revision of 1874, page 337; Revision of 1877, page 464; 2 G.S. 1615; 2 C.S. 2627; Supp.to C.S. (1930) 799. The provisions of these statutes as revised and amended have been carried forward into the 1937 revision and will now be found as R.S. 3:7-14 to R.S. 3:7-20, which now govern *Page 75 
the appointment of testamentary guardians and prescribe their powers and duties. The last mentioned statutory provisions were in effect at the date of Dr. Wiener's will and at his death. An examination of these various statutes will disclose that although the father has had the statutory right and power to appoint a testamentary guardian for his infant child since 1795 (Pat.192) it was not until 1871 (P.L. 1871 ch. CI p. 23) that the consent of the mother to such appointment was required; and it was not until 1928 (P.L. 1928 ch. 6 p. 16) that the mother,the father being alive, was given the same right to such appointment as was theretofore enjoyed by the father, although by the 1871 act above cited, the mother, being a widow, was empowered to appoint a testamentary guardian. The act of 1871 was repealed in 1874 (Rev. P.L. 1874 pp. 142, 170 ¶ 347; Rev. 1877p. 1120 Appendix B ¶ 345) and its provisions were then incorporated in "An Act Relative to Guardians and the Estates of Minors," App. March 27th, 1874, above cited.
In R.S. 3:7-25 it is provided that "when an orphan is under the age of fourteen years the mother or the next of kin of full age * * * may apply to the Ordinary, Orphans Court or surrogate for the guardianship of the orphan." The use of the the word "mother" in these statutes is significant. It will be noted that in this statute no allusion is made to a mother by adoption, and in the statutes referred to up to and including 2 C.S. 2627, the provision for consent relates to the consent of the "mother."
The word "mother" is defined in Bouvier's Law Dictionary as "a woman who has borne a child." It was not until the mother was empowered to appoint a testamentary guardian that the consent of the "surviving parent" was required, and obviously the purpose of this change in the language of the statute was to include either a surviving father or mother who "begat" the child.
The statute authorizing the appointment of a testamentary guardian now in force is R.S. 3:7-14 to 21. Sections 14, 15 and 16 read as follows: *Page 76 
"3:7-14. Power to designate testamentary guardian.
"Subject to the provisions of section 3:7-15 of this title, either parent, whether over or under the age of twenty-one years, may, by deed, duly acknowledged or proved or by will duly executed, dispose of the custody and tuition of any of such parent's children, including children en ventre sa mere, under the age of twenty-one years and unmarried at the time of the death of the appointing parent.
"The appointment herein authorized may be made for the minority of the child or any portion thereof, and may be made in possession or remainder."
"3:7-15. Consent of surviving parent; formal requisites.
"When the other parent of the child is living, the appointment authorized by section 3:7-14 of this title shall be effective only when such other parent consents to such appointment in writing signed and acknowledged by the consenting parent in the presence of two witnesses present at the same time who subscribe their names as witnesses thereto in the presence of the consenting parent. Such consent shall, at the time the will making the appointment is admitted to probate, be proved to have been so given and acknowledged."
"3:7-16. Appointment of testamentary guardian by surviving parent.
"If no guardian has been appointed pursuant to sections 3:7-14 and 3:7-15 of this title, the sole surviving parent of a minor child or children may, by his or her will duly executed, appoint a guardian for his or her minor child or children in all cases in which one parent is authorized to make such appointment with the consent of the other. A guardian so appointed shall have the same power and authority as a guardian appointed pursuant to said sections 3:7-14 and 3:7-15."
The question now to be determined is the meaning of the terms "parent," "surviving parent," "other parent" and "sole surviving parent" as used in sections 14, 15 and 16 of this act. By analogy these terms should have the same meaning and be given the same construction as like terms used in R.S. 9:3. I have already held that these terms as used in that statute refer to the natural parent who "begat" the child, and not to the adoptive or statutory parent made such by the decree of adoption. I think it logically follows that these terms as used in R.S. 3:7-14, 15
and 16 have the same meaning, and I so hold. It follows that the petitioner's consent to Dr. Wiener's appointment of a testamentary guardian for his infant son was not required by the statute, and such testamentary disposition of the child's custody is valid. *Page 77 
 III. Care, Custody and Guardianship in General R.S. 9:2 — Abandonment.
Although the foregoing conclusions might well be considered as dispositive of the issues here involved, some discussion of another analogous statute, R.S. 9:2, and the effect of petitioner's alleged abandonment of her adopted child upon her claimed right to his custody, may not be amiss.
At common law the father had the preferred right to the custody of his minor child. State v. Stigall and Turnley,22 N.J. Law 286; Morris v. Wardell, 67 Atl. Rep. 850; State v. Baird andTorrey, 18 N.J. Eq. 194; but now, by statute, in the event of a controversy between the parents of a minor child, the rights of both parents, in the absence of misconduct, are equal; and it is expressly provided in R.S. 9:2-4 that the father shall not have preference over the mother.
But the section of this statute most pertinent to the present controversy is R.S. 9:2-5, which is a re-enactment of paragraph 11 of chapter 92, P.L. 1902 p. 264 (C.S. p. 2810 ¶ 23) and reads as follows:
"9:2-5. Death of parent having custody; reversion of custody to surviving parent; appointment of guardian by court of chancery.
"In case of the death of the parent to whom the care and custody of the minor children shall have been awarded by the court of chancery, or in case of the death of the parent inwhose custody the children actually are, when the parents havebeen living separate and no award as to the custody of suchchildren has been made, the care and custody of such minorchildren shall not revert to the surviving parent without adecree of the court of chancery to that effect; and the court of chancery shall have the right, upon petition of a next friend on behalf of the children, to appoint such friend or other suitable person, guardian of such minor children, and shall have the right to remove such guardian, and to appoint a new guardian or guardians, and to make such orders from time to time, as the circumstances of the case and the benefit of the children shall require." (Italics mine.)
In connection with the inquiry as to the effect of petitioner's alleged abandonment of the child upon her right *Page 78 
to custody, the provisions of R.S. 9:3-4 and those of R.S.9:2-5 should be considered together. R.S. 9:3-4 subsection b, dealing with the consent required for adoption, requires the written consent of the parents; but subdivision c provides that the consent of a parent who has forsaken parental obligations is unnecessary. R.S. 9:2-5, referred to and quoted above, provides that in the case of the death of the parent in whose custody the infant actually is, the parents having been living separate and no award of custody having been made, the care and custody of the infant shall not revert to the surviving parent without a decree of this court to that effect.
I think the plain intent of this section of the statute (R.S.9:2-5) was that an inquiry by this court should be made into the fitness of a surviving parent to have the care and custody of his or her child, which the parent had presumably abandoned, before permitting such parent to regain such care and custody. Obviously, the legislature considered such presumed abandonment aprima facie forfeiture of parental rights.
That the parents' rights to the custody of their child may be transferred or abandoned, and that the consent of the parent who has abandoned a child is not necessary to its adoption, was held in Ex parte Kirschner, 111 Atl. Rep. 737, and in Wood v.Wood, 77 N.J. Eq. 593. See, also, P.L. 1902 p. 259; P.L. 1905p. 272; R.S. 9:3-4 subsec. c. Also in Winans v. Luppie,47 N.J. Eq. 302, where the Court of Errors and Appeals had under consideration the provisions of the adoption statute (Rev. Stat.1877 p. 1345) requiring the parents' consent, it was held that:
"Under the statute above mentioned, a parent may be deemed to have abandoned his child, so as to render his written consent to the adoption of the child unnecessary, when his conduct has evinced a settled purpose to forego all parental duties and relinquish all parental claims to the child."
In that case Mr. Justice Dixon, speaking for the appellate court (at p. 304), said:
"The statutory notion of abandonment does not necessarily, we think, imply that the parent has deserted the child, or even *Page 79 
ceased to feel any concern for its interests. It fairly may, and in our judgment does, import any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. Such a purpose, clearly manifested, certainly forms a more reasonable ground for permitting judicial discretion to decide whether another may assume these claims and duties, than does the signature of the parent, which a mere impulse may induce. It does not follow that the purpose may not be repented of, and in proper cases all parental rights again acquired, including this statutory right of preventing adoption by withholding consent; but, when once the abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child. When, in pursuance perhaps of the abandonment, new ties have been formed and a new station in life has been taken by the child, it might be unjust that, solely because of the parent's caprice, legal sanction should be refused to the new conditions. Under such circumstances, a court might lawfully deem the abandonment irrevocable, so far as the claims of the parent were concerned."
In Wood v. Wood, supra, the same court, referring to the opinion of the Orphans Court with approval, said:
"As we read it, the conclusion expressed is that while there has been no actual abandonment, i.e., desertion, of the child by its mother, there has been such conduct on the part of the mother as amounts to an abandonment within the meaning of that word as used in the statute."
In Ex parte Kirschner, supra, it was held that while the rights to the custody of infants might be transferred or abandoned, the duty to support them could not be thus evaded.
Thus it will be seen that even in the case of a natural parent, if such parent has forsaken parental obligations, the consent of that parent to adoption even by a stranger is unnecessary. Only the parent who has actual custody and control of the child and who exercises parental obligations need consent; and in the case of the death of the parent who has actual custody of the child, but who has been living separate and apart from the father or mother of the child, as the *Page 80 
case may be, the right to the custody of such child shall not revert to the surviving parent without a court order. The provisions of these two statutes touching the effect of an abandonment of a child upon the abandoning parent's right to custody are, I think, strongly indicative of a state policy respecting the custody of infants. These provisions relate primarily to the rights of a natural parent to the custody of his or her infant child. A fortiori the policy should be applied to an artificial or statutory parent who has abandoned his or her adopted child, and especially should this be so where the abandonment results from the voluntary act of the parent evidenced by a solemn writing.
Here we are determining whether or not petitioner has "forsaken parental obligations" within the meaning of the statute, and the legislature has not left us without an answer to the question as to what constitutes abandonment within its terms. Subdivision h of section 4 (R.S. 9:3-4) provides that "A person shall be deemed to have forsaken parental obligations within the meaning of this chapter when he or she shall have willfully and continuously either neglected or failed to perform the natural and regular obligations of care and support of the child." It would be difficult to conceive of more positive proof of abandonment within the meaning of this language than the petitioner's execution of the separation agreement by which the child's custody was committed to the father, plus her own admission that for nearly five years thereafter she had no contact with the child. In the instant case we need only bear in mind that after Dr. Wiener's marriage subsequent to the petitioner's divorce, if he had elected to permit his new wife to adopt his child, only his own consent would have been necessary. The renunciation of custody by the petitioner, and the subsequent forsaking of all parental obligations by her would have dispensed with the necessity of obtaining her consent to such adoption, even if she had been the child's natural mother. If the petitioner's consent was not necessary to the adoption of the child by another person, it follows, by analogy, that it was not necessary to the appointment of a testamentary guardian by the child's natural father. *Page 81 
 Welfare and Happiness of Child.
Thus far we have been considering the statutory rights of parents.
The statutes do not, of course, in a proper proceeding to that end, prevent a disposition of custody according to the best interests of the infant. "In dealing with the custody and control of infants, their welfare and happiness, and not filial affections, is the primary consideration. The natural right of the father (parent) to the custody of his child is not an absolute property right, but rather a trust reposed in the father (parent) by the state as parens patriae." In re Lippincott,97 N.J. Eq. 517. In any proceeding involving the custody of an infant the principal consideration is the welfare of the child.In re Elmer's Guardianship, 125 N.J. Eq. 148. The statute itself (R.S. 9:2-4) provides that "the happiness and welfare of the children shall determine the custody or possession." But guardianship of an infant's person will not be awarded to one person and the guardianship of his estate to another except in cases of hardship. At one of the hearings in this cause it was suggested on behalf of the petitioner that the child's custody be committed to her, the testamentary guardian remaining in control of its estate. But it has been held that "the mother of the infant will not be appointed a guardian of its person for convenience alone while another is appointed guardian of its estate." In re Ross, 53 N.J. Eq. 344; Tenbrook v. Colm,12 N.J. Law 97.
"In resolving the general question of what will best subserve the interest and happiness of the child, its own wish and choice may be considered and given weight, if it be of an age and capacity to form a rational judgment. There is no fixed age which capacitates such choice. It depends upon the extent of its mental development." Richards v. Collins, 45 N.J. Eq. 283-287.
But it has been held that on an issue as to who should be awarded the custody of a child of ten years the Chancellor will not consult the child's predilection. Hesselman v. Haas,71 N.J. Eq. 689.
A stepfather or stepmother, as such, has no right to the *Page 82 
custody of a stepchild. Persons standing in loco parentis have a right of custody as against strangers. The statutory right of custody applies only to parents or guardians. Ex parte Flynn,87 N.J. Eq. 413.
But this is not a proceeding to remove a testamentary guardian on the ground of unfitness. It is true that in this proceeding the petitioner sought to prevent the respondents from qualifying as testamentary guardians, but only upon the grounds that the testamentary appointment was invalid. The petitioner grounds her claim of right to the child's custody in the statute concerning adoption; the respondents, in the provisions of the several statutes herein considered read together. The battle has been fought on statutory legal grounds. No charge of unfitness is made by either party against the other and there is nothing in the evidence before me which would in the slightest degree indicate the unfitness of either. The respondents have accepted the trust reposed in them and they are in no way disqualified. They appeared before me in open court, testified concerning their home and family life and their relations with Dr. Wiener and his first wife, the child's natural mother. They are wholesome Christian people and apparently have a real affection for the child. Mrs. Hall was a very intimate friend of the child's mother. Their friendly relations with Dr. Wiener continued to the time of his death. In 1938, or thereabouts, Dr. Wiener placed his son in a school at or near Richmond, Virginia, and under the general supervision of the respondents, who visited him there frequently. The boy spent many week ends at respondents' home which is near Richmond, and Mrs. Hall exercised a motherly care over him, purchasing and caring for his clothing, c., all at Dr. Wiener's request. It was at this time that Dr. Wiener requested the respondents to accept the appointment as testamentary guardians of his son and they consented to do so. This arrangement was carried out by the execution of Dr. Wiener's will, a copy of which he sent to the respondents immediately after it was executed. The arrangement then made was never changed. In my judgment, it would be difficult to find a couple more suitable in every way to have the care and custody of this child and his estate than the respondents, *Page 83 
even if I were at liberty to disregard the provisions of Dr. Wiener's will.
But the child's predilections and the father's intentions, other than those expressed in his will, are stressed and strongly relied upon by the petitioner. Numerous letters addressed to her by the infant during 1941 and indicating cordial and affectionate relations between them, were offered in evidence before the master who took a part of the proofs, over the objections of counsel for the respondent. But the predilections and preferences of the infant are not, of course, controlling (Richards v.Collins; Hesselman v. Haas, supra) even if the statutory rights of the father were to be disregarded. No letters from the petitioner to the child were offered in evidence or proved to have been written.
There was also one letter addressed to the petitioner by Dr. Wiener on June 9th, 1941, likewise received in evidence by the master over the objection of counsel for the respondents. Its contents are touching and persuasive of an intention never put into effect. From this letter I quote the following:
"June, I'm arranging my affairs so that when anything happens to me — Joe is to go to you absolutely without strings or ties — and my or rather his affairs will pass into your hands. I wouldn't want it otherwise, and I hope I'm correct in knowing it is also what you want. Should you have any ideas on the subject please let me know your wishes in the matter. I want to be guided not only by my feelings but also by yours. Yes, June, you are his mother — he has always felt that and it is what he feels now — and God knows he has every right and reason to feel that. Joe is a strange and rather amazing little animal. I've never yet ceased being amazed at the things he says and does. He has a good mind and up to this time I have not seriously tried to influence it as his future. I'd rather wait a bit longer to see if he develops any inclinations which are worthy of encouraging. I shall try to let him choose his future, and until such time as he shows definite interests, I'm anxious for him to just round his education before embarking on special training. At present he is just a little boy, with some of the virtues and many of the faults of little boys.
"I'm so glad that you find so much pleasure in Nancy and that she is so pretty and bright. I hope she will be a source of continued happiness to you. I'm sure having both Joe and Nancy together this summer will be most interesting, to say the least. By the way, Joe has asked me to arrange his arrival in Tucson on or before the 17th. That is his way of asking to be with you on your birthday. Will wire you the time of his arrival." *Page 84 
Bearing in mind that testator's will was executed in 1938 and that at the time this letter was written he was suffering from a heart ailment from which he died only three months later (in this letter he mentions a severe attack suffered a short time before) it may be justly inferred that he contemplated changing or revoking the provisions of his will touching the guardianship of his son; and there can be no doubt but that when he wrote that letter he had definitely determined to commit the custody of his child to his divorced wife, the petitioner, with whom his relations were cordial if not still affectionate. But he did not do so. There is no proof that petitioner ever replied to that letter or that she in any way acquiesced in Dr. Wiener's suggestion. At most it was a suggestion of desire and intention never consummated. There is other evidence in the testimony of witnesses produced on behalf of the respondents, that subsequent to the date of that letter Dr. Wiener considered the advisability of creating a trust fund for the benefit of his son and naming a trust company as trustee, but without changing the provisions of his will with respect to the guardianship of his child. What prompted this subsequent attitude we do not know. There is no evidence on this point. It may be that the petitioner declined, or, by her silence, evaded, the proffered responsibility. This conjecture is supported by no evidence, but it is, I think, a justifiable inference. However, the fact remains that Dr. Wiener did not change his will or revoke the provisions touching the guardianship of his child. Nor was there ever any change in or abrogation of the previous arrangements made with the respondents. A will is, of course, ambulatory until the death of the testator. Testator's will having remained unchanged at his death, we must presume that it expressed his desires and intentions as of that date, otherwise he would have altered the document. This court may not write a new will for him, however much it might approve of the sentiments expressed in testator's letter or disapprove of the testamentary appointment. The statutory right of the father, exercised by him in the execution of his will, must be respected and maintained. The petition will be dismissed. *Page 85