827 A.2d 203

PATRICK MORIARTY, PLAINTIFF–RESPONDENT, v. JULIA E.
BRADT, DEFENDANT, AND LYNN JACK BRADT AND
PATRICIA BRADT, INTERVENORS–APPELLANTS.

Argued January 21, 2003—Decided July 14, 2003.

*Francis W. Donahue,* argued the cause for appellants (*Donahue, Hagan, Klein & Newsome,* attorneys; *Mr. Donahue, Eric S. Solotoff* and *Jennifer E. Jacobson,* on the briefs).

*Robert T. Corcoran,* argued the cause for respondent (*Mr. Corcoran,* attorney; *Mr. Corcoran* and *Christopher R. Cavalli,* on the briefs).

*Ronald K. Chen,* argued the cause for *amicus curiae* American Civil Liberties Union of New Jersey (*Mr. Chen* and *J.C. Salyer,* attorneys).

*Walter A. Lesnevich* and *Rochell Babroff,* a member of the District of Columbia and Maryland bars, submitted a brief on behalf of *amicus curiae* AARP Foundation Litigation (*Lesnevich & Marzano–Lesnevich,* attorneys).

The opinion of the Court was delivered by

LONG, J.

In *Troxel v. Granville*, 530 *U.S.* 57, 120 *S.Ct.* 2054, 147 *L.Ed.*2d 49 (2000), the United States Supreme Court struck down what it denominated as a "breathtakingly broad" grandparent visitation statute enacted by the State of Washington. That decision has cast a cloud over the grandparent visitation statutes of the remaining forty-nine states. In this case, we are called on to assess our own Grandparent Visitation Statute (*N.J.S.A.* 9:2–7.1) in light of *Troxel* and in light of our prior jurisprudence on the subject. More particularly, because the grandparents in this case seek to override the father's determination regarding visitation, we are asked to test the statute against the fundamental right of fit parents to make decisions regarding the care and custody of their children. We hold that grandparents seeking visitation under the statute must prove by a preponderance of the evidence that denial of the visitation they seek would result in harm to the child. That burden is constitutionally required to safeguard the due process rights of fit parents. Finally, we hold that, in this case, the grandparents have met that burden.

I

Julia Bradt and Patrick Moriarty were married on April 26, 1987. The marriage resulted in the birth of two children, Brian in 1987 and Tara in 1990. Eventually the couple separated and Moriarty instituted a divorce action. At the time of the separation, Bradt was hospitalized for drug abuse and the children remained with Moriarty. In order to secure visitation time with Brian and Tara, Bradt's parents, Lynn Jack Bradt and Patricia Thornton Bradt (the grandparents), intervened in the divorce action.

A hearing was held on September 25, 1991. At that time, Bradt withdrew her application for custody and the parties reached an agreement regarding custody and visitation. On October 28, 1991, the trial court entered a *pendente lite* order memorializing the agreement. By its terms, the court granted Moriarty custody of

the children and granted the grandparents visitation on alternate weekends from Thursday evening through Sunday evening. The court further ordered the grandparents to pick up and return the children to Moriarty's home in Linden, New Jersey. Bradt was initially denied visitation unless supervised by her parents. The trial court also appointed a mental health expert to conduct an examination of Moriarty, Bradt, and the children.

On April 15, 1993, after an eight-day trial, a dual final judgment of divorce was entered. Both Moriarty and Bradt had proven their claims of extreme cruelty and Moriarty had additionally proven that Bradt was an habitual drug user. As a result, Moriarty was granted sole custody of the children. Bradt was granted supervised visitation in the grandparents' presence, which was allowed to take place in Pennsylvania because the grandparents had agreed to submit to the jurisdiction of the Family Part on every aspect of the case; permitted one hour of telephone contact with the children on non-visitation days; ordered to continue psychiatric therapy; required to undergo random weekly drug testing with the results forwarded to Moriarty; ordered to abstain from non-prescription drug and alcohol use; and required to attend weekly meetings of Alcoholic Anonymous and other support groups. Moreover, Bradt and the grandparents were forbidden to have the children treated medically except in an emergency situation.

Both parties remarried in 1994. In August 1994, Bradt was granted unsupervised visitation, which took place in New Jersey. The grandparents saw the children during most weekends that Bradt had visitation. However, significant animosity developed between Moriarty and the grandparents. Moriarty claimed that he feared for his children's safety when they visited their grandparents alone. On one occasion while with the grandparents in the Poconos, Brian pulled a cup of hot chocolate down on himself, resulting in second- and third-degree burns to his face, neck, and chest. The grandparents took Brian to the local hospital for treatment and had a neighbor who was a pediatrician, Dr. Chen,

make sure that he had been treated properly. After learning of the incident, when the grandparents returned the children Moriarty approached them in an aggressive manner. As a result, the grandmother obtained a final restraining order against Moriarty.

On another occasion, Brian broke his leg while in the grandparents' care. In addition, Moriarty testified that the children were bruised and cut when they were returned from visitation, as well as sick and dirty. Moriarty also testified that the grandparents and Bradt took Brian for steroid treatments for stress-induced asthma for months without informing him. However, the grandparents' long-time friend testified that they had a warm, close relationship with the children and their son James testified that they exhibited good parenting skills.

Bradt died on November 8, 1999, apparently from an overdose of prescription pain medication and cold medicine. On hearing about Bradt's death, Moriarty testified that he contacted his family priest and a bereavement counselor to determine how to handle the situation in a way that would be in the children's best interests. According to Moriarty's testimony, the bereavement counselor advised that the children should attend Bradt's wake and that a bereavement ceremony at the children's church for their mother after her funeral was appropriate; however, the counselor advised that it would not be in the children's best interests to attend their mother's funeral. Moriarty relayed that information to the grandparents. In response, they moved on an emergency basis before the trial court to permit the children to attend their mother's funeral. The court granted the motion and ordered "regular and continual visitation with the grandparents."

On December 3, 1999, the grandparents filed an emergency application for holiday visitation with the children because Moriarty had refused their request. On December 16, 1999, the trial court held a hearing on the issue, resulting in a consent order granting holiday visitation with the children from December 26 to December 28, 1999, and thereafter, once every five weeks, consisting of two consecutive overnight visits until a plenary hearing on

the merits could be held. Among other things, the court ordered diagnostic evaluations of Moriarty, the grandparents, the children, and Bradt's husband.

On January 26, 2000, a court-ordered probation investigation report was filed with the court, which noted that Moriarty insisted on supervised visitation because he believed that the grandparents were responsible for their daughter's psychiatric problems. Moriarty further told the evaluators that he feared that the grandparents could have a negative influence on the children.

Family Services completed the court-ordered diagnostic evaluations and the team filed its report. In that evaluation, the Family Services team noted that the grandmother had obtained a bachelor's degree in zoology, as well as a master's degree and a doctorate in biology. For approximately eighteen years, the grandmother was a professor and research scientist at Lehigh University. Since 1993, she had been employed at Muhlenberg College as a professor of environmental science. The grandfather graduated with a dual degree in mechanical and industrial engineering and had taken other courses, including business courses at Harvard. He founded a business that manufactured a type of conveyor belt based on technology that he had patented. He served as that company's chief executive officer for thirty years. In addition, the grandfather had worked as a business consultant and a teacher.

Moriarty's background is similarly impressive. He obtained a bachelor's degree in business and economics, as well as a master's degree in economics. He joined the Air Force and attended Flight School. He subsequently served several years in the Air Force Reserve. At the time of the report, Moriarty was employed as an executive vice-president and partner running a hedge fund. He and his wife have five children: two children from her previous marriage, his two children, and one child in common.

Based on its interviews, the team determined that the grandparents could "serve as a conduit with the children's deceased mother and can be a positive resource for the children in many ways."

Accordingly, the report recommended unsupervised grandparent visitation once per month for two full days in New Jersey, while the grandparents stayed overnight in a hotel and the children slept at home. Moreover, the report recommended that the grandparents attend the children's weekend activities; have regular telephone and email contact with them; have holiday visitation, so long as it did not interfere with the children's activities; and if no contraindications, visitation should progress to taking place once monthly at the grandparents' home, subject to the children's scheduled activities.

In June 2000, Moriarty filed a motion for summary judgment on the issue of grandparent visitation in light of the United States Supreme Court's ruling in *Troxel v. Granville*, 530 *U.S.* 57, 120 *S.Ct.* 2054, 147 *L.Ed.*2d 49 (2000), that had invalidated the State of Washington's grandparent visitation statute on constitutional grounds because it infringed on fit parents' constitutional rights to rear their children. Moriarty then offered the following visitation schedule that he believed to be in the best interests of the children: the grandparents were allowed to visit one day each month during an activity or activities of either or both of the children, on either Saturday or Sunday, and for two hours after such activity for lunch or dinner. That schedule further provided that all visitation would occur in Bergen County and that the children would not be permitted to leave Bergen County at any time during the visitation. Moriarty agreed that by the fifth of each month, he would furnish the grandparents with the date, time, and place of the activity or activities that they would be invited to attend. In his certification in support of the motion, Moriarty reiterated that he was "not attempting to eliminate contact between [his] children and their maternal grandparents"; rather, he was seeking to establish a visitation schedule that he believed was in his children's best interests.

On June 28, 2000, the trial court adjourned Moriarty's summary judgment motion and granted additional summer visitation to the grandparents for five consecutive days in July 2000. Moriarty

applied for a stay of that summer visitation order, which was denied. On August 7, 2000, the trial court heard additional oral argument on Moriarty's motion for summary judgment. Moriarty argued that *Troxel* factually was similar to his case and thus, the trial court was required to defer to his decision, as a fit parent, regarding grandparent visitation. The grandparents responded that Moriarty's visitation proposal was effectively no visitation. In addition, although the grandparents conceded that a fit parent's decision regarding visitation is entitled to some deference, they argued that the New Jersey statute mandates a hearing to determine whether the proposed visitation is in the best interest of the children.

In denying the motion, the trial court noted the "extremely heavy burden" that the grandparents would have to carry under the ruling in *Troxel*. The trial court ordered a plenary hearing to afford the grandparents the opportunity to present expert testimony and their witnesses. At the hearing, the court noted that the grandparents had modified their request to once a month visitation, alternating between two overnights and daytime visits of five to six hours. Furthermore, the grandparents sought two weeks of extended visitation over the summer—one week in July and one in August.

The hearing concluded on October 20, 2000, with the trial court reserving its decision. During the hearing, however, the court entered an order granting the grandparents overnight visitation with the children at their home in Easton, Pennsylvania for two nights on the weekend of October 6, 2000. On November 9, 2000, after detailed factual findings, the trial court rendered its decision and ordered grandparent visitation as follows: (1) monthly visitation alternating between a five-hour day visit one month and a visit with two overnights the next month and (2) one extended visitation period in July or August. The court specifically noted that the reason it ordered that visitation was its reliance on the grandparents' expert who opined that such visitation was "to

protect the children from the harm that would befall them if they were alienated from their grandparents."

Moriarty appealed the trial court's order, primarily on the basis that New Jersey's statute is unconstitutional as applied in this case and accordingly, that the trial court abused its discretion in not abiding by the schedule that he had proposed. While that appeal was pending, Moriarty continued to make additional demands on the grandparents' visitation schedule ordered by the court. Those conditions included: taking the children to Roman Catholic mass; refraining from drinking any alcohol in the children's presence; not leaving the children alone, separating them, or placing them with strangers; not leaving them alone with their Uncle George, "an admitted homosexual"; and if the children became ill or injured, returning them home immediately. The trial court granted the additional condition regarding emergency illnesses or injuries. With respect to church attendance, the grandparents obviated the need for a court ruling by agreeing to take the children to mass. The other conditions that Moriarty sought unilaterally to impose on the grandparents' visitation time with the children were denied.

In an unpublished opinion, the Appellate Division reversed the trial court and remanded for implementation of visitation as requested by Moriarty. The panel stressed that, "[w]e find no fault with the judge's factual findings[.]" Slip op. at 20. However, it noted that Moriarty's "substantive due process rights were violated by the imposition of the visitation ordered," in light of his alternative proffer. Slip op. at 19. In view of *Troxel,* the panel held that the decision of a fit parent to curtail grandparental visitation "cannot, under these facts, be subject to attack." Slip op. at 20. "[I]nterference with plaintiff's parental decision to afford the limited visitation offered was constitutionally impermissible." Slip op. at 21.

We granted the grandparents' petition for certification, 174 *N.J.* 189, 803 *A.*2d 1161 (2002). We also granted *amici* status to the

State of Jersey, the AARP, and the American Civil Liberties Union (ACLU). We now reverse.

## II

The grandparents argue that the Grandparent Visitation Statute is constitutional; that a fit parent's decisions are entitled to deference, but are not absolute; and that the decision of the Appellate Division "eviscerates the grandparent visitation statute and thirty years of jurisprudence" supporting the rights of grandparents. The Attorney General and the AARP support those contentions.

Moriarty counters that the Appellate Division's decision is in accordance with *Troxel* and our prior case law and that the statute as applied is unconstitutional. The ACLU supports Moriarty and argues that the statute, as applied, violates due process by unconstitutionally infringing on the right of a fit parent to make decisions regarding his or her child's care and upbringing. More particularly, the ACLU urges us to hold that such parental decisions can be overridden only by clear and convincing evidence of demonstrable harm.

## III

At common law, grandparents had no legal right to petition for visitation with their grandchildren. Kristine L. Roberts, *State Supreme Court Applications of Troxel v. Granville and the Courts' Reluctance to Declare Grandparent Visitation Statutes Unconstitutional,* 41 *Fam. Ct. Rev.* 14, 15 (2003) (footnotes omitted); Ann M. Stanton, *Grandparents' Visitation Rights and Custody,* 7 *Child & Adolescent Psychiatric Clinics of N. Am.* 409, 411 (1998); Scott C. Boen, Note, *Grandparent Visitation Statutes: The Constitutionality of Court Ordered Grandparent Visitation Absent a Showing of Harm to the Child,* 20 *J. Juv. L.* 23, 28 (1999) (footnote omitted). In *Mimkon v. Ford,* we summarized five basic reasons for the historical denial of grandparent visitation:

(1) Ordinarily the parent's obligation to allow the grandparent to visit the child is moral, and not legal.

(2) The judicial enforcement of grandparent visitation rights would divide proper parental authority, thereby hindering it.

(3) The best interests of the child are not furthered by forcing the child into the midst of a conflict of authority and ill feelings between the parent and grandparent.

(4) Where there is a conflict as between grandparent and parent, the parent alone should be the judge, without having to account to anyone for the motives in denying the grandparent visitation.

(5) The ties of nature are the only efficacious means of restoring normal family relations and not the coercive measures which follow judicial intervention.

[66 *N.J.* 426, 431, 332 *A.2d* 199 (1975) (quoting Duncan Gault, *Statutory Grandparent Visitation,* 5 *St. Mary's L.J.* 474, 480–81 (1973) (internal citations omitted)).]

That reasoning flowed from the social science research of the day. In fact, historically, there was practically no research regarding grandparents because most studies that related to family life were guided by emphasis on the "isolated nuclear family." Chrystal C. Ramirez Barranti, *The Grandparent/Grandchild Relationship: Family Resource in an Era of Voluntary Bonds,* 34 *Fam. Rel.* 343, 344 (1985). Even positing a role for grandparents was viewed as "antithetical to the norms of self-reliance and independence which were attributed to the nuclear family." *Ibid.* (citations omitted). Originally, those attitudes reflected the fact that longevity rates did not allow most grandparents to play a long-term role in their grandchildren's lives. *Id.* at 343.

Things began to change as grandparents lived longer and had more opportunity to forge a sustained and lengthy relationship with their grandchildren. *Ibid.* The rise in family breakups also played a part in reinvigorating the grandparents' role. *Id.* at 346; *see* Thomas E. Denham & Craig W. Smith, *The Influence of Grandparents on Grandchildren: A Review of the Literature and Resources,* 38 *Fam. Rel.* 345, 345 (1989) (noting that increased longevity rates and demographic changes, such as family disruption through divorce, alcoholism, and/or other social problems, "have opened the door to a new and growing emphasis on grandparenthood"). Against that setting, new explorations of the grandparents' role in American society were begun in the late

1950s through the 1970s. Ramirez Barranti, *supra*, 34 *Fam. Rel.* at 344. Additional initiatives were aimed at developing "typologies" of grandparenthood. *Ibid.; see also* Denham & Smith, *supra*, 38 *Fam. Rel.* at 347 (noting that typologies assist in characterizing "types of behavior" and "style of interaction" that take place). Many such typologies emerged, including but not limited to historian, mentor, role model, and nurturer. Ramirez Barranti, *supra*, 34 *Fam. Rel.* at 345 (citing Arthur Kornhaber, M.D. & Kenneth L. Woodward, *Grandparents/Grandchildren: The Vital Connection* (1981)).

Moreover, the importance of the grandparent-grandchild relationship in the lives of children has been confirmed. *See id.* at 346–47 (describing studies by Baranowski, Kornhaber and Woodward, and Mead in support of that contention).

> The emotional attachments between grandparents and grandchildren have been described as unique in that the relationship is exempt from the psycho-emotional intensity and responsibility that exists in parent/child relationships. The love, nurturance, and acceptance which grandchildren have found in the grandparent/grandchild relationship "confers a natural form of social immunity on children that they cannot get from any other person or institution."
>
> [*Id.* at 346 (citing Kornhaber & Woodward, *supra*, at xiii-xiv).]

Commentators have suggested that, "[i]n the absence of a grandparent/grandchild relationship, children experience a deprivation of nurturance, support, and emotional security." *Id.* at 346–47 (describing studies by Kornhaber and Woodward and Mead). Indeed, Kornhaber and Woodward posited that "'the complete emotional well-being of children requires that they have a direct, and not merely derived, link with their grandparents.'" *Id.* at 347 (quoting Kornhaber & Woodward, *supra*, at 163). Mead advanced the notion that "when an individual does not have intergenerational family relationships there is a resulting lack of cultural and historical sense of self." *Ibid.*

To be sure, those broad conclusions would not necessarily apply to a grandparent with an emotional disorder or serious character or behavioral flaws or to one who placed the child in danger or sought to subvert the relationship of the child to his parents. *See, e.g., King v. King*, 828 *S.W.*2d 630, 632(Ky.) (noting that children

"ordinarily benefit" from contact with grandparents that are "physically, mentally, and morally fit"), *cert. denied,* 506 *U.S.* 941, 113 *S.Ct.* 378, 121 *L.Ed.*2d 289 (1992); Stanton, *supra,* 7 *Child & Adolescent Psychiatric Clinics of N. Am.* at 410 (noting that grandparents who interfere with childrearing and parental discipline can negatively affect family relationships). Grandparents, like every other group of humans in society, are not monolithic. They range across the spectrum from wholesome nurturers to bad influences. *See* Karen Czapanskiy, *Grandparents, Parents and Grandchildren: Actualizing Interdependency in Law,* 26 *Conn. L.Rev.* 1315, 1324–31 (1994) (noting that psycho-social research indicates that not all grandparent/grandchild relationships are beneficial to grandchildren; rather, many grandparent/grandchild relationships merely provide grandchildren with ephemeral benefits). Thus, although as a general proposition the grandparents' role in a child's life may be very important, each case in which grandparents are pitted against parents over visitation with grandchildren must stand or fall on its own facts. *See Troxel, supra,* 530 *U.S.* at 73, 120 *S.Ct.* at 2064, 147 *L.Ed.*2d at 61 (observing that "much state-court adjudication" regarding grandparent visitation "occurs on a case-by-case basis"). That is the backdrop on which our Grandparent Visitation Statute was enacted.

### IV

In 1972, New Jersey, replicating what would eventually take place in all fifty states,[1] enacted the Grandparent Visitation Statute. *N.J.S.A.* 9:2–7.1 (*L.* 1971, *c.* 420, § 1, effective Feb. 1, 1972). That statute, as amended in 1973, afforded standing to grandparents to seek visitation when "either or both of the parents of a

---

[1] *See Troxel, supra,* 530 *U.S.* at 73–74 n. *, 120 *S.Ct.* at 2064 n. *, 147 *L.Ed.*2d at 61 n. * (setting forth grandparent visitation statutes in all fifty states); Maegen E. Peek, Note, *Grandparent Visitation Statutes: Do Legislatures Know the Way to Carry the Sleigh Through the Wide and Drifting Law?,* 53 *Fla. L.Rev.* 321, 326 n. 30 (2001) (citing same).

minor child ... is or are deceased, or divorced or living separate and apart in different habitats...." *N.J.S.A.* 9:2–7.1 (as amended by *L.* 1973, *c.* 100, § 1). The statute was amended in 1987 to allow siblings to apply for visitation with the child. *N.J.S.A.* 9:2–7.1 (as amended by *L.* 1987, *c.* 363, § 2). Thus, prior to 1993, "intact families" (those not disrupted by death or divorce) were not subject to statutory visitation rights of grandparents.

In 1993, *N.J.S.A.* 9:2–7.1, was amended to provide:

a. A grandparent or any sibling of a child residing in this State may make application before the Superior Court, in accordance with the Rules of Court, for an order for visitation. It shall be the burden of the applicant to prove by a preponderance of the evidence that the granting of visitation is in the best interests of the child.

b. In making a determination on an application filed pursuant to this section, the court shall consider the following factors:

(1) The relationship between the child and the applicant;

(2) The relationship between each of the child's parents or the person with whom the child is residing and the applicant;

(3) The time which has elapsed since the child last had contact with the applicant;

(4) The effect that such visitation will have on the relationship between the child and the child's parents or the person with whom the child is residing;

(5) If the parents are divorced or separated, the time sharing arrangement which exists between the parents with regard to the child;

(6) The good faith of the applicant in filing the application;

(7) Any history of physical, emotional or sexual abuse or neglect by the applicant; and

(8) Any other factor relevant to the best interests of the child.

c. With regard to any application made pursuant to this section, it shall be prima facie evidence that visitation is in the child's best interest if the applicant had, in the past, been a full-time caretaker for the child.

[*N.J.S.A.* 9:2–7.1 (as amended by *L.* 1993, *c.* 161, § 1 (effective June 29, 1993)).]

The effect of the new statute was to expand the scope of grandparents' visitation rights and to remove the requirement that the parents be deceased or divorced. The Act became effective June 29, 1993.

We detailed the legislative history of the latest version of the Act in *In re Adoption of a Child by W.P. & M.P.*:

On May 20, 1993, the General Assembly gave final approval to the Grandparent Visitation Statute. The bill was signed into law by Governor Florio on June 29,

1993, and became effective that same day. As previously stated, the new law eliminated the requirement that a child's parents be deceased, divorced or separated in order for a grandparent to apply for visitation rights. Instead, the statute provides that "a grandparent or any sibling of a child residing in this State" may apply for visitation, and it instructs the Superior Court to consider eight enumerated factors when determining whether the grant of such visitation is in the best interests of the child.

In its original form, the bill did not enumerate factors, requiring only that visitation be in the best interests of the child, with no guidance to the courts. In an apparent response to concerns that it constituted "a gross invasion of the sanctity and privacy of the family unit," the bill was amended, setting forth the eight factors as a way of limiting the intrusive elements of the act. *See* Letter from Cary B. Cheifetz, Esq., Skoloff & Wolfe, to Gov. Jim Florio (Dec. 22, 1992) (enclosing proposed bill setting forth specific criteria that protect child's best interests).

A precursor to the current statute Assembly Bill No. 1475 was prefiled for introduction in the 1990 session. That version expressly required that the court consider the objections of a parent to an application for visitation by that parent's parent (i.e., the child's grandparent). *See* Assembly Bill No. 1475, Prefiled for Introduction in the 1990 Session. According to the bill statement accompanying Bill No. 1475, the purpose of that provision was to "ensure that the court does not grant visitation to a parent's own blood relatives without considering whether the parent may object to such visitation." *Id.* at 2 (emphasis [omitted]). Although that provision was not enacted in the final bill, it suggests that the Legislature believed that parental autonomy should be afforded deference.

[163 *N.J.* 158, 165–66, 748 *A.2d* 515 (2000).]

In essence, our statute has undergone transformation over the years, and grants standing to grandparents and siblings to seek visitation with a child. Its structure underscores the fact-sensitive nature of the inquiry by detailing seven particularized considerations for the court and instructing the court to consider as well, "any other factor" relevant to the child's best interests.

■ The Grandparent Visitation Statute, like all others, is presumed to be constitutional—"a presumption that may be rebutted only on a showing that a provision of the Constitution is clearly violated by the statute." *In re Adoption of a Child by W.P.,* *supra,* 163 *N.J.* at 192, 748 *A.2d* 515 (Poritz, C.J., dissenting) (citing *Board of Educ. v. Caffiero,* 86 *N.J.* 308, 318, 431 *A.2d* 799, *appeal dismissed,* 454 *U.S.* 1025, 102 *S.Ct.* 560, 70 *L.Ed.2d* 470 (1981)).

## V

The right to rear one's children is so deeply embedded in our history and culture that it has been identified as a fundamental liberty interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Wisconsin v. Yoder,* 406 *U.S.* 205, 232–33, 92 *S.Ct.* 1526, 1541–42, 32 *L.Ed.*2d 15, 35 (1972) (explaining "primary role" of parents in raising their children as "an enduring American tradition" and the Court's historical recognition of that right as fundamental). Although often expressed as a liberty interest, childrearing autonomy is rooted in the right to privacy. *See Prince v. Massachusetts,* 321 *U.S.* 158, 166, 64 *S.Ct.* 438, 442, 88 *L.Ed.* 645, 652 (1944) (observing existence of "private realm of family life which the state cannot enter"); *V.C. v. M.J.B.,* 163 *N.J.* 200, 218, 748 *A.*2d 539 (remarking that "the right of a legal parent to the care and custody of his or her child derives from the notion of privacy"), *cert. denied,* 531 *U.S.* 926, 121 *S.Ct.* 302, 148 *L. Ed.*2d 243 (2000). Eighty years ago in *Meyer v. Nebraska,* the United States Supreme Court characterized the right of parents to bring up their children "as essential to the orderly pursuit of happiness by free men." 262 *U.S.* 390, 399, 43 *S.Ct.* 625, 626, 67 *L.Ed.* 1042, 1045 (1923) (citations omitted).

In *Prince,* the Court elaborated on that right, declaring that "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." 321 *U.S.* at 166, 64 *S.Ct.* at 442, 88 *L.Ed.* at 652 (citation omitted). The Court further stated, "[I]t is in recognition of this [right] that [*Pierce v. Society of Sisters,* 268 *U.S.* 510, 45 *S.Ct.* 571, 69 *L.Ed.* 1070 (1925) and *Meyer, supra,* 262 *U.S.* 390, 43 *S.Ct.* 625, 67 *L.Ed.* 1042,] have respected the private realm of family life which the state cannot enter." *Prince, supra,* 321 *U.S.* at 166, 64 *S.Ct.* at 442, 88 *L.Ed.* at 652. In *Yoder,* the Court recognized that a child is not a " 'mere creature of the State; those who nurture him and direct his destiny have the

right, coupled with the high duty, to recognize and prepare him for additional obligations.'" 406 *U.S.* at 233, 92 *S.Ct.* at 1542, 32 *L.Ed.*2d at 35 (quoting *Pierce, supra,* 268 *U.S.* at 534–35, 45 *S.Ct.* at 573, 69 *L.Ed.* at 1078). The Court observed that the "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Yoder, supra,* 406 *U.S.* at 232, 92 *S.Ct.* at 1541–42, 32 *L.Ed.*2d at 35; *see also Stanley v. Illinois,* 405 *U.S.* 645, 651, 92 *S.Ct.* 1208, 1212, 31 *L.Ed.*2d 551, 558 (1972) (noting constitutional protection of parent's interest in "companionship, care, custody, and management of his or her children"); *Pierce, supra,* 268 *U.S.* at 534–35, 45 *S.Ct.* at 573, 69 *L.Ed.* at 1078 (noting parents' and guardians' liberty interest "to direct the upbringing and education of children under their control"). We have recognized unfailingly that deeply embedded right in our jurisprudence as well. *Watkins v. Nelson,* 163 *N.J.* 235, 245, 748 *A.*2d 558 (2000); *V.C., supra,* 163 *N.J.* at 217–18, 748 *A.*2d 539; *In re Guardianship of K.H.O.,* 161 *N.J.* 337, 346, 736 *A.*2d 1246 (1999).

To be sure, the constitutional imperative of preserving familial integrity is not absolute. *Yoder, supra,* 406 *U.S.* at 233–34, 92 *S.Ct.* at 1542, 32 *L.Ed.*2d at 35; *Prince, supra,* 321 *U.S.* at 166, 64 *S.Ct.* at 442, 88 *L.Ed.* at 652; *V.C., supra,* 163 *N.J.* at 218, 748 *A.*2d 539. Situations have arisen requiring a state to exercise its *parens patriae* authority to guard children from harm. *See Prince, supra,* 321 *U.S.* at 166–67, 64 *S.Ct.* at 442, 88 *L.Ed.* at 652 (recognizing when circumstances place child in imminent danger, or affect his well-being, state could properly intrude on that "private realm of family life" to protect child from harm). Thus, for example, our courts have overridden the desires of parents who refused to consent to medical treatment and ordered such treatment to save a child's life. *See Parham v. J.R.,* 442 *U.S.* 584, 603, 99 *S.Ct.* 2493, 2504, 61 *L.Ed.*2d 101, 119 (1979) ("Nonetheless, we have recognized that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." (citations omitted)); *Prince, supra,* 321 *U.S.* at 166–67, 64 *S.Ct.* at 442, 88 *L.Ed.*

at 652–53 (noting that state, as *parens patriae*, can intrude on parental autonomy to protect child from ill health or death); *Jehovah's Witnesses v. King County Hosp. Unit No. 1*, 278 *F.Supp.* 488, 498–99, 504–05 (W.D.Wash.1967) (holding Washington State statute that declared children to be dependents of state for purpose of authorizing blood transfusions against expressed wishes of parents was constitutional), *aff'd*, 390 *U.S.* 598, 88 *S.Ct.* 1260, 20 *L.Ed.2d* 158 (1968) (per curiam); *State v. Perricone*, 37 *N.J.* 463, 474, 181 *A.2d* 751 (finding state may act under its *parens patriae* authority to protect child's welfare by declaring him or her neglected to obtain necessary medical treatment), *cert. denied*, 371 *U.S.* 890, 83 *S.Ct.* 189, 9 *L.Ed.2d* 124 (1962); *Muhlenberg Hosp. v. Patterson*, 128 *N.J.Super.* 498, 503, 320 *A.2d* 518 (Law Div.1974) (ordering blood transfusion to infant over parents' wishes).

■ Summing up, when the State seeks, by statute, to interfere with family and parental autonomy, a fundamental right is at issue. That statute thus is subject to strict scrutiny and will only pass muster if it is narrowly tailored to serve a compelling state interest. *Washington v. Glucksberg*, 521 *U.S.* 702, 720–21, 117 *S.Ct.* 2258, 2268, 138 *L.Ed.2d* 772, 787–88 (1997); *Roe v. Wade*, 410 *U.S.* 113, 155–56, 93 *S.Ct.* 705, 728, 35 *L.Ed.2d* 147, 178 (1973) (citations omitted); *Brown v. City of Newark*, 113 *N.J.* 565, 573, 552 *A.2d* 125 (1989) (citations omitted); *see also Roth v. Weston*, 259 *Conn.* 202, 789 *A.2d* 431, 441–42 (2002) (noting that strict scrutiny is required where fundamental right of parents to care, custody, and control of their children is implicated and that statutory scheme infringing on same must be narrowly tailored "so that a person's personal affairs are not needlessly intruded upon and interrupted by the trauma of litigation" (citation omitted)); *Lulay v. Lulay*, 193 *Ill.2d* 455, 250 *Ill.Dec.* 758, 739 *N.E.2d* 521, 532 (2000) (holding that because Illinois grandparent visitation statute infringes on fundamental right of parents to upbringing of their children, state must prove that statute serves compelling state interest and is narrowly tailored to serve that compelling interest); *Rideout v. Riendeau*,

761 *A.*2d 291, 299–300 (Me.2000) (explaining that "heightened protection against state intervention in parents' fundamental right to make decisions concerning the care, custody, and control of their children" requires "strict scrutiny of the statute at issue" (citations omitted)); *Blixt v. Blixt,* 437 *Mass.* 649, 774 *N.E.*2d 1052, 1059 (2002) (observing that strict scrutiny requires compelling state interest to justify state action and "careful examination to ascertain whether the action taken was 'narrowly tailored to further [that] interest'" (quotation omitted)), *cert. denied,* 537 *U.S.* 1189, 123 *S.Ct.* 1259, 154 *L.Ed.*2d 1022 (2003); *Hoff v. Berg,* 595 *N.W.*2d 285, 290–91 (N.D.1999) (applying strict scrutiny and noting that "'the idea of strict scrutiny acknowledges that [ ] political choices ... burdening fundamental rights ... must be subjected to close analysis in order to preserve substantive values of equality and liberty.'" (quoting Laurence H. Tribe, *American Constitutional Law* § 16–6 at 1451 (2d ed.1988))).

## VI

On that backdrop, we turn to the United States Supreme Court's recent decision in *Troxel.* There, the Court addressed the constitutionality of the Washington State nonparental visitation statute, *Wash. Rev.Code* § 26.10.160(3) (1994), that provided: "'Any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances.'" *Troxel, supra,* 530 *U.S.* at 61, 120 *S.Ct.* at 2057–58, 147 *L.Ed.*2d at 54. The grandparents in *Troxel,* whose son had committed suicide, initially sought two weekends of overnight visitation per month, as well as two weeks of visitation each summer with their grandchildren with whom they had a long-standing pre-existing relationship. *Id.* at 60–61, 120 *S.Ct.* at 2058, 147 *L.Ed.*2d at 53–54. The mother did not oppose visitation; rather, she sought to limit that visitation to one day per month

without an overnight stay. *Id.* at 61, 120 *S.Ct.* at 2058, 147 *L.Ed.*2d at 54.

After a trial, the trial court ruled in favor of the grandparents because "'it is normally in the best interest of the children to spend quality time with the grandparent.'" *Id.* at 69, 120 *S.Ct.* at 2062, 147 *L.Ed.*2d at 59 (quotation omitted). The court ordered visitation one weekend per month, one week during the summer, and four hours on each of the grandparents' birthdays. *Id.* at 61, 120 *S.Ct.* at 2058, 147 *L.Ed.*2d at 54 (citations omitted). It stated:

> The [grandparents] are part of a large, central, loving family, all located in this area, and the [grandparents] can provide opportunities for the children in the areas of cousins and music.... The children would be benefitted from spending quality time with the [grandparents], provided that that time is balanced with time with the children['s] nuclear family.
>
> [*Id.* at 61–62, 120 *S.Ct.* at 2058, 147 *L.Ed.*2d at 54 (quotation omitted).]

The Washington Court of Appeals reversed and dismissed the grandparents' petition on the basis that "nonparents lack standing to seek visitation under § 26.10.160(3) unless a custody action is pending." *Id.* at 62, 120 *S.Ct.* at 2058, 147 *L.Ed.*2d at 54. The grandparents appealed, and the Washington Supreme Court affirmed. *Id.* at 62–63, 120 *S.Ct.* at 2058, 147 *L.Ed.*2d at 55. The court found that the grandparents had standing based on the unambiguous language of § 26.10.160(3) but affirmed the appellate court's ultimate ruling that the grandparents were not entitled to visitation under the statute because the statute impermissibly interfered with the fundamental right of parents to rear their children. *Id.* at 62–63, 120 *S.Ct.* at 2058, 147 *L.Ed.*2d at 55. Clearly underpinning the court's decision was its conviction that the best interest standard articulated in the statute was insufficient to serve as a compelling state interest. *See id.* at 63, 120 *S.Ct.* at 2058, 147 *L.Ed.*2d at 55 (noting that Washington Supreme Court observed that state only has compelling interest warranting interference with parental autonomy to protect child from harm or potential harm).

The United States Supreme Court, in a plurality opinion authored by Justice O'Connor, reaffirmed that the parental right to

raise children is guaranteed by the Due Process Clause of the Fourteenth Amendment and held that the Washington statute impermissibly intruded on the mother's rights. *Id.* at 65–67, 120 *S.Ct.* at 2059–61, 147 *L.Ed.*2d at 56–58. First, the Court focused on the "breathtakingly broad" nature of the Washington statute because it permitted any person, at any time, to petition a court for visitation and permitted a court to decide that visitation was in a child's best interest. *Id.* at 67, 120 *S.Ct.* at 2061, 147 *L.Ed.*2d at 57. Second, the Court observed that the statute failed to accord any special weight to a parent's decision regarding visitation. *Id.* at 67, 120 *S.Ct.* at 2061, 147 *L.Ed.*2d at 57. "Thus, in practical effect, . . . a court can disregard and overturn *any* decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests." *Id.* at 67, 120 *S.Ct.* at 2061, 147 *L.Ed.*2d at 57–58 (emphasis in original).

Third, the Court noted that no party had alleged that the mother was an unfit parent. *Id.* at 68, 120 *S.Ct.* at 2061, 147 *L.Ed.*2d at 58. As such, the presumption that a fit parent acts in the best interests of his or her child was turned on its head by effectively assuming a presumption in favor of visitation and placing the burden of disproving visitation on the mother, a fit parent. *Id.* at 69, 120 *S.Ct.* at 2062, 147 *L.Ed.*2d at 58.

Finally, the Court noted that there was no allegation that the mother sought to discontinue visitation between the grandparents and her children; rather, she sought to limit that visitation to an amount that she believed was in her daughters' best interest. *Id.* at 71, 120 *S.Ct.* at 2062–63, 147 *L.Ed.*2d at 60. Given that combination of factors, in conjunction with the Washington trial court's "slender findings," the Court held that § 26.10.160(3) as applied to the mother was unconstitutional. *Id.* at 72, 120 *S.Ct.* at 2063–64, 147 *L.Ed.*2d at 60–61.

The Court avoided the basic issue of the appropriate level of scrutiny and the standard to be applied. It also stopped short of invalidating nonparental visitation statutes *per se* and declined to

define "the precise scope of the parental due process right in the visitation context" because "the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied" as "much state-court adjudication in this context occurs on a case-by-case basis." *Id.* at 73–74, 120 *S.Ct.* at 2064, 147 *L.Ed.*2d at 61–62 (citations omitted). Consequently, the Court did not rule on whether a showing of harm or potential harm to a child is required as a condition precedent to ordering visitation. *Id.* at 73, 120 *S.Ct.* at 2064, 147 *L.Ed.*2d at 61.

Justice Souter concurred in the judgment but would have affirmed the decision of the Washington Supreme Court, which invalidated § 26.10.160(3) on its face because of the overbroad statutory language. *Id.* at 75–77, 120 *S.Ct.* at 2065–66, 147 *L.Ed.*2d at 62–64 (Souter, J., concurring in judgment). Justice Thomas authored a brief opinion concurring in the judgment, wherein he noted that the Court failed to articulate the "appropriate standard of review." *Id.* at 80, 120 *S.Ct.* at 2068, 147 *L.Ed.*2d at 65 (Thomas, J., concurring in judgment). Justice Thomas would have applied strict scrutiny because a fundamental right was implicated and would have invalidated the statute because of its inability to pass that level of scrutiny. *Id.* at 80, 120 *S.Ct.* at 2068, 147 *L.Ed.*2d at 65 (Thomas, J., concurring in judgment).[2]

---

[2] Justices Stevens, Scalia, and Kennedy each dissented on different grounds. Justice Stevens specifically rejected the requirement of a threshold showing of actual or potential harm to the child before nonparental visitation is permissible. *Id.* at 85–86, 120 *S.Ct.* at 2070–71, 147 *L.Ed.*2d at 68–69 (Stevens, J., dissenting). He instead invoked a balancing approach, weighing all of the interests at stake in any given case. *Id.* at 88–89, 120 *S.Ct.* at 2072, 147 *L.Ed.*2d at 70 (Stevens, J., dissenting). Justice Scalia would have reversed. *Id.* at 93, 120 *S.Ct.* at 2075, 147 *L.Ed.*2d at 73 (Scalia, J., dissenting). In his opinion, state legislatures are the prime determiners of family law principles. *Id.* at 93, 120 *S.Ct.* at 2074–75, 147 *L.Ed.*2d at 73 (Scalia, J., dissenting). He further questioned the validity of any substantive due process right to parent a child. *Id.* at 92, 120 *S.Ct.* at 2074, 147 *L.Ed.*2d at 72–73 (Scalia, J., dissenting). Justice Kennedy agreed that parents have a Fourteenth Amendment right to parent their children without undue state interference, *id.* at 95, 120 *S.Ct.* at 2076, 147 *L.Ed.*2d at 74–75 (Kennedy, J., dissenting), but argued that the Constitution does not foreclose application of the best interests of the child standard in any visitation proceed-

The Supreme Court of Arkansas recently reduced the holding in *Troxel* to its basic elements. *Linder v. Linder,* 348 *Ark.* 322, 72 *S.W.*3d 841, 852–55 (2002). We agree with that analysis:

> To summarize, six Justices agreed that the case should be affirmed (O'Connor, Rehnquist, Ginsburg, Breyer, Souter, and Thomas). Eight Justices agreed that the Fourteenth Amendment protects a parent's right to raise his or her child without undue interference from government (all but Scalia; Thomas with reservations). Five Justices agreed that a fit parent is accorded a presumption that the parent acts in the child's best interests (O'Connor, Rehnquist, Ginsburg, Breyer, and Stevens). Four Justices (O'Connor, Rehnquist, Ginsburg, and Breyer) agreed that "special factors" must "justify" the state's intrusion, and that one of those factors is a finding of parental unfitness.

[*Id.* at 855.]

In sum, although eschewing the articulation of the level of scrutiny and the standard to be applied to a grandparent visitation statute, *Troxel* instructs at least this much—that a fit parent has a fundamental due process right to the care and nurturance of his or her children; that that right is protected where a nonparental visitation statute respects a fit parent's decision regarding visitation by (1) according him or her the "traditional presumption" that a fit parent acts in the best interests of the child; and (2) giving "special weight" to a fit parent's determination regarding visitation. *Troxel, supra,* 530 *U.S.* at 66, 69, 120 *S.Ct.* at 2060, 2062, 147 *L.Ed.*2d at 57–59. Other salient factors mentioned in *Troxel* include: the breadth of a statute's standing requirement, *id.* at 67, 120 *S.Ct.* at 2061, 147 *L.Ed.*2d at 57; whether harm or potential harm is required before a court may order visitation, *id.* at 73, 120 *S.Ct.* at 2064, 147 *L.Ed.*2d at 61; the denial of visitation in its entirety, *id.* at 71, 120 *S.Ct.* at 2062–63, 147 *L.Ed.*2d at 60; and whether the statute requires more than a simple best interest analysis, *id.* at 67, 120 *S.Ct.* at 2061, 147 *L.Ed.*2d at 57–58. Many state courts have decoded *Troxel*'s elliptical message in similar fashion. *See, e.g., Roth, supra,* 789 *A.*2d at 439 (concluding that *Troxel* plurality found that Washington statute was unconstitutional as applied because trial court

---

ing, *id.* at 98–99, 120 *S.Ct.* at 2077–78, 147 *L.Ed.*2d at 76–77 (Kennedy, J., dissenting).

made no finding of unfitness; trial court failed to accord any weight to mother's determination of her children's best interests; and no allegation was made that visitation was cut off completely); *Rideout, supra,* 761 *A.*2d at 297 (determining that *Troxel* provided some "guidance on important points," including that parents have fundamental right to care, custody, and control of their children, which does not give way to third party's petition for visitation; best interests standard, without more, is insufficient for state to interfere with parental decision making; and special weight must be given to parents' decisions because of presumption that he or she acts in child's best interest); *Blixt, supra,* 774 *N.E.*2d at 1058–59 (construing *Troxel* to provide following guideposts: reaffirmation of parent's liberty interest in raising his or her child is fundamental right; any person should not be granted standing to seek visitation; presumption exists that parents act in child's best interest, which warrants significant deference; and potential impact of grandparent visitation on parent-child relationship should be considered in trial court's analysis).

## VII

Courts across the country have wrestled with the issue of grandparent visitation both before and after *Troxel.* In general, they have engaged in one of two modes of analysis: (1) interpreting the statutes to require satisfaction of a harm standard in order to overcome the presumption in favor of a fit parent's decision or (2) avoiding the articulation of any standard at all and analyzing the statutes on a case-by-case basis. *Troxel* implied that either approach would be acceptable. Roberts, *supra,* 41 *Fam. Ct. Rev.* at 22 (footnotes omitted).

Courts in the former category have undertaken traditional strict scrutiny review. That review routinely focuses on whether a compelling state interest warrants state intrusion into family life. Because parental autonomy is a fundamental right, the majority of those courts have rejected any compelling interest short of harm to the health or welfare of a child. As such, those courts have

required a threshold showing of harm prior to utilizing a best interests analysis to protect parental rights. *See, e.g., Brooks v. Parkerson,* 265 *Ga.* 189, 454 *S.E.*2d 769, 773 n. 5 (Ga.) ("[T]he 'best interest of the child' standard does not come into play to permit interference with the custody and control of the child, over parental objection, unless and until there is a showing of *harm* to the child without that interference."), *cert. denied,* 516 *U.S.* 942, 116 *S.Ct.* 377, 133 *L.Ed.*2d 301 (1995); *In re Herbst,* 971 *P.*2d 395, 399 (Okla.1998) ("To reach the issue of a child's best interests, there must be a requisite showing of harm, or threat of harm.... Absent a showing of harm, (or threat thereof) it is not for the state to choose which associations a family must maintain and which the family is permitted to abandon."); *Hawk v. Hawk,* 855 *S.W.*2d 573, 580 (Tenn.1993) (requiring "an initial showing of harm ... before the state may intervene to determine the 'best interests of the child' "); *Williams v. Williams,* 256 *Va.* 19, 501 *S.E.*2d 417, 418 (1998) (" '[B]efore visitation can be ordered over the objection of the child's parents, a court must find an actual harm to the child's health or welfare without such visitation. A court reaches consideration of the "best interests" standard in determining visitation only after it finds harm if visitation is not ordered.' " (quotations omitted)); *but see, e.g., Rideout, supra,* 761 *A.*2d at 300–01 (applying strict scrutiny standard of review and rejecting harm as only permissible compelling state interest but noting that that interest requires "something more than the best interest of the child" (footnote omitted)); *Michael v. Hertzler,* 900 *P.*2d 1144, 1147, 1151 (Wyo.1995) (conducting strict scrutiny review but finding that because right to associate with one's family is fundamental right of parents, children, and grandparents, court found that best interests balancing test was sufficient to weigh those interests).

Courts in the latter category have simply compared the structure of their statutes to the one invalidated in *Troxel* to assess constitutionality. *See, e.g., Jackson v. Tangreen,* 199 *Ariz.* 306, 18 *P.*3d 100 (Ct.App.2000) (determining that *Troxel* had no bearing on Arizona's grandparent visitation statute because that statute

was more narrowly drawn than Washington statute in *Troxel*), *cert. denied*, 534 *U.S.* 953, 122 *S.Ct.* 351, 151 *L.Ed.*2d 265 (2001); *Lopez v. Martinez*, 85 *Cal.App.*4th 279, 102 *Cal.Rptr.*2d 71 (2000) (finding that California grandparent visitation statute was "not affected" by *Troxel* because statute was more narrowly drawn than Washington statute); *Galjour v. Harris*, 795 *So.*2d 350 (La.Ct.App.) (holding Louisiana grandparent visitation statute constitutional because it was more limited than Washington statute in *Troxel*), *writ denied*, 793 *So.*2d 1229, 1230(La.), *cert. denied*, 534 *U.S.* 1020, 122 *S.Ct.* 545, 151 *L.Ed.*2d 422 (2001); *Blakely v. Blakely*, 83 *S.W.*3d 537 (Mo.2002) (en banc) (finding Missouri grandparent visitation statute constitutional because statute avoids Washington statute's "sweeping breadth" in several respects); *State ex rel. Brandon L. v. Moats*, 209 *W.Va.* 752, 551 *S.E.*2d 674 (2001) (holding West Virginia grandparent visitation constitutional because it is much narrower than the Washington statute in *Troxel*). Although such an approach necessarily precludes clear categorization, the leitmotif that runs through those cases is that the best interests standard standing alone, will not survive a constitutional challenge, although what more is needed is left unspoken. *See* Roberts, *supra*, 41 *Fam. Ct. Rev.* at 26–27 (stating that post-*Troxel* decisions have recognized that best interests standard alone, without some deference to parents, does not adequately protect parental autonomy); *Developments in the Law—The Law of Marriage and Family—Changing Realities of Parenthood: The Law's Response to the Evolving American Family and Emerging Reproductive Technologies*, 116 *Harv. L.Rev.* 2052, 2059 (2003) (noting that *Troxel* demands "something more" than best interests standard to safeguard parental autonomy). Those courts essentially accept *Troxel*'s instruction that best interests is insufficient to intrude on parental autonomy. *See Troxel*, *supra*, 530 *U.S.* at 67–68, 120 *S.Ct.* at 2061, 147 *L.Ed.*2d at 57–58 (explaining that trial court cannot overrule fit parent's decision "based solely on the judge's determination of the child's best interests").

## VIII

Unlike our sister states, many of which felt compelled to develop a new and constitutionally appropriate standard for grandparent visitation, we have, as recently as 2000, confronted the issue in a cognate setting. In *Watkins v. Nelson,* 163 *N.J.* 235, 748 *A.*2d 558 (2000), we were faced with a struggle between the grandparents and a natural father over the custody of a nineteen-month-old child. The grandparents' daughter, who was the child's mother and custodial parent, had died. The Appellate Division, applying a best interests standard, ruled in favor of the grandparents. We reversed, based on our conclusion that the application of that standard violated the fundamental right of the father to family autonomy. In so ruling, Justice Coleman, speaking for the Court, reiterated that

> the right of natural parents to the custody, care and nurturing of their children has risen to the stature of a fundamental right and deserves special protection. *Santosky v. Kramer,* 455 *U.S.* 745, 753, 102 *S.Ct.* 1388, 1394, 71 *L.Ed.*2d 599[, 606] (1982); *Stanley v. Illinois,* 405 *U.S.* 645, 651–652, 92 *S.Ct.* 1208, 1212–1213, 31 *L.Ed.*2d 551[, 558–59] (1972) (and cases cited); *In re Guardianship of Dotson,* 72 *N.J.* 112, 122, 367 *A.*2d 1160 (1976) (Pashman, J., concurring); *State v. Perricone,* 37 *N.J.* 463, 472, 181 *A.*2d 751 (1962), *cert. den[ied],* 371 *U.S.* 890, 83 *S.Ct.* 189, 9 *L.Ed.*2d 124 (1962). *See In re N.,* 96 *N.J.Super.* 415, 424–425 n. 5, 233 *A.*2d 188 (App.Div.1967).
>
> [*Watkins, supra,* 163 *N.J.* at 245, 748 *A.*2d 558 (quoting *In re D.T.,* 200 *N.J.Super.* 171, 176–77, 491 *A.*2d 7 (App.Div.1985)).]

In setting forth an appropriate standard, he stated:

> Since the right of parents to the custody of their minor children is both a natural and legal right, the law should not disturb the parent/child relationship except for the strongest reasons and only upon a clear showing of a parent's gross misconduct or unfitness or of other extraordinary circumstances affecting the welfare of the child. *See* 59 [*Am.Jur.2d] Parent and Child,* § 25 at 107–108 (1971).
>
> [*Watkins, supra,* 163 *N.J.* at 245, 748 *A.*2d 558 (quoting *In re D.T., supra,* 200 *N.J.Super.* at 176–77, 491 *A.*2d 7).]

Justice Coleman went on to characterize that standard as deeply rooted in our jurisprudence:

> Not surprisingly, the concept that a presumption of custody exists in favor of a parent, and that only a showing of unfitness, abandonment, gross misconduct, or "exceptional circumstances" will overcome this presumption, is steeped in the history and common law of this State. *See, e.g., In re D.T., supra,* 200 *N.J.Super.* at 175–76, 491 *A.*2d 7; *E.T. v. L.P.,* 185 *N.J.Super.* 77, 84, 447 *A.*2d 572

(App.Div.1982); *S. v. H.M. & E.M.,* 111 *N.J.Super.* 553, 558–59, 270 *A.*2d 48 (App.Div.1970); *Kridel v. Kridel,* 85 *N.J.Super.* 478, 489, 205 *A.*2d 316 (App.Div. 1964); *In re Mrs. M.,* 74 *N.J.Super.* 178, 183–84, 186, 181 *A.*2d 14 (App.Div.1962); *In re Adoption of B. by E. & R.,* 152 *N.J.Super.* 546, 551, 378 *A.*2d 90 (Union County Ct.1977); *Jacobson v. Jacobson,* 146 *N.J.Super.* 491, 497, 370 *A.*2d 65 (Ch.Div.1976); *Ex parte Alsdorf,* 142 *N.J.Eq.* 246, 252–53, 59 *A.*2d 610 (Ch.1948); *Gardner v. Hall,* 132 *N.J. Eq.* 64, 78, 26 *A.*2d 799 (Ch.1942), *aff'd* [,] 133 *N.J.Eq.* 287, 31 *A.*2d 805 (E. & A.1943); *Pope v. Brown,* 3 *N.J. Misc.* 572, 572–73, 128 *A.* 851 (Ch.1925); *Hesselman v. Haas,* 71 *N.J.Eq.* 689, 694, 64 *A.* 165 (Ch.1906).

[*Watkins, supra,* 163 *N.J.* at 246, 748 *A.*2d 558.]

He explained:

> The principle that a showing of gross misconduct, unfitness, neglect, or "exceptional circumstances" affecting the welfare of the child will overcome this presumption, is a recognition that a parent's right to custody is not absolute. That parental right must, at times, give way to the State's *parens patriae* obligation to ensure that children will be properly protected from serious physical or psychological harm. *In re Guardianship of K.H.O.,* 161 *N.J.* 337, 347, 736 *A.*2d 1246 (1999); *In re Guardianship of J.C.,* 129 *N.J.* 1, 10, 608 *A.*2d 1312 (1992). This has been our law for more than a century. As early as 1889, the highest Court in this State allowed the presumption in favor of a natural parent to be overcome by a showing of "exceptional circumstances." *Richards v. Collins,* 45 *N.J.Eq.* 283, 17 *A.* 831 (E. & A. 1889). More recently, in *Sorentino v. Family & Children's Soc. of Elizabeth,* 72 *N.J.* 127, 131–132, 367 *A.*2d 1168 (1976), *appeal after remand,* 74 *N.J.* 313, 378 *A.*2d 18 (1977), the Court acknowledged that even if parental rights cannot be terminated on statutory grounds, "exceptional circumstances" based on the probability of serious psychological harm to the child may deprive a parent of custody. *Ibid. Sees v. Baber,* 74 *N.J.* 201, 221–22, 377 *A.*2d 628 (1977), recognized the same principle.

[*Watkins, supra,* 163 *N.J.* at 246–47, 748 *A.*2d 558.]

Importantly, in distinguishing between best interests and the proper standard—gross misconduct, unfitness, or exceptional circumstances—Justice Coleman observed:

> A significant difference between the child's best interests test and the parental termination or "exceptional circumstances" standard is that the former does not always require proof of harm to the child. In contrast, *the latter always requires proof of serious physical or psychological harm or a substantial likelihood of such harm.*

[*Id.* at 248, 748 *A.*2d 558 (emphasis added).]

In other words, avoiding harm to the child is polestar and the constitutional imperative that is necessary to overcome the presumption in favor of the parent's decision and to justify intrusion into family life.

Once the presumption is overcome, *Watkins* explains the methodology to be adopted:

> The standard that controls a custody dispute between a third party and a parent involves a two-step analysis. The first step requires application of the parental termination standard or a finding of "exceptional circumstances." Although an award of custody to a third party does not involve a termination of all parental rights, "such an award destroys any pretense of a normal parent-child relationship and eliminates nearly all of the natural incidents of parenthood including everyday care and nurturing which are part and parcel of the bond between a parent and child." *Zack v. Fiebert*, 235 *N.J.Super.* 424, 432, 563 *A.2d* 58 (App.Div.1989). "It is cardinal [in our society] that the custody, care and nurture of the child reside first in the parents." *Ginsberg v. New York*, 390 *U.S.* 629, 639, 88 *S.Ct.* 1274, 1280, 20 *L.Ed.2d* 195[, 204] (1968). Because the right to custody is a fundamental one protected by the constitution, *In re Guardianship of K.H.O.*, *supra*, 161 *N.J.* at 347, 736 *A.2d* 1246, the parental termination or "exceptional. circumstances" standard is required to pass constitutional muster in this type of custody dispute. That principle is consistent with *Zack* and *Todd*, which stand for the proposition that when a third party, such as a stepparent, establishes psychological parentage with the child, the third party stands in the shoes of a natural parent. *Zack*, *supra*, 235 *N.J.Super.* at 432–33, 563 *A.2d* 58; [*Todd v. Sheridan*, 268 *N.J.Super.* 387, 397, 633 *A.2d* 1009, 1014 (App.Div.1993)]. That means that when the "exceptional circumstances" prong is satisfied, for example by establishing that the third party has become a psychological parent, the standard for determining custody is the same as between two fit parents: the child's best interest test articulated in *N.J.S.A.* 9:2–4c. *Zack*, *supra*, 235 *N.J.Super.* at 433, 563 *A.2d* 58.
>
> If either the statutory parental termination standard or the "exceptional circumstances" prong is satisfied, the second step requires the court to decide whether awarding custody to the third party would promote the best interests of the child. A child's "best interests" standard "does not contain within it any idealized lifestyles." [*In re Baby M*, 109 *N.J.* 396, 460, 537 *A.2d* 1227, 1260 (1988)]. It "can never mean the better interest of the child." *Division of Youth [&] Family [Servs.] v. A.W.*, 103 *N.J.* 591, 603, 512 *A.2d* 438 (1986). "It is not a choice between a home with all the amenities and a simple apartment, or an upbringing with the classics on the bookshelf as opposed to the mass media, or even between parents or providers of vastly unequal skills." *Ibid.* (citations omitted). That said, the point to be emphasized is that the best interest of the child cannot validly ground an award of custody to a third party over the objection of a fit parent without an initial court finding that the standard for termination of the rights of a non-consenting parent or the "exceptional circumstances" prong has been satisfied.
>
> [*Watkins*, *supra*, 163 *N.J.* at 253–55, 748 *A.2d* 558.]

 Because the Grandparent Visitation Statute is an incursion on a fundamental right (the right to parental autonomy), under *Watkins*, it is subject to strict scrutiny and must be narrowly tailored to advance a compelling state interest. Our

prior jurisprudence establishes clearly that the only state interest warranting the invocation of the State's *parens patriae* jurisdiction to overcome the presumption in favor of a parent's decision and to force grandparent visitation over the wishes of a fit parent is the avoidance of harm to the child. When no harm threatens a child's welfare, the State lacks a sufficiently compelling justification for the infringement on the fundamental right of parents to raise their children as they see fit. However, when harm is proved and the presumption in favor of a fit parent's decision making is overcome, the court must decide the issue of an appropriate visitation schedule based on the child's best interests.

Although *Troxel* avoided confronting that issue directly, we are satisfied that prior United States Supreme Court decisions fully support our conclusion that interference with parental autonomy will be tolerated only to avoid harm to the health or welfare of a child. *Compare Yoder,* 406 *U.S.* at 230, 92 *S.Ct.* at 1540–41, 32 *L.Ed.*2d at 33–34 (noting that interference with childrearing was not justified because Amish children would not be physically or mentally *harmed* from receiving an Amish education as opposed to public education (emphasis added)); *Stanley, supra,* 405 *U.S.* at 649, 92 *S.Ct.* at 1211, 31 *L.Ed.*2d at 557 (requiring showing of parental *unfitness* with concomitant harm to child before termi-nating unwed father's parental rights (emphasis added)); *Pierce, supra,* 268 *U.S.* at 534, 45 *S.Ct.* at 573, 69 *L.Ed.* at 1078 (holding that state's interest was inadequate to justify interference in family life because children were not *harmed* by parents' decision to send their children to private schools as those schools fulfilled their obligations (emphasis added)); *Meyer,* 262 *U.S.* at 403, 43 *S.Ct.* at 628, 67 *L. Ed.* at 1046–47 (striking down state law that forbade children from learning foreign language because, among other things, such knowledge was not "so clearly *harmful* as to justify its inhibition with the consequent infringement of rights long freely enjoyed" (emphasis added)), *with Prince, supra,* 321 *U.S.* at 169–70, 64 *S.Ct.* at 444, 88 *L.Ed.* at 654 (upholding parent's conviction for violating state child labor laws because selling

religious magazines to public could lead to emotional, psychological, or physical *injury* to child (emphasis added)).

In reaching that conclusion, it bears repeating that a dispute between a fit custodial parent and the child's grandparent is not a contest between equals. We have long recognized that the best interest standard, which is the tiebreaker between fit parents,[3] is inapplicable when a fit parent is in a struggle for custody with a third party. *Watkins, supra,* 163 *N.J.* at 253–54, 748 *A.*2d 558; *Todd, supra,* 268 *N.J.Super.* at 396–97, 633 *A.*2d 1009; *Zack, supra,* 235 *N.J.Super.* at 432–33, 563 *A.*2d 58.

Because custody and visitation applications by a third party both implicate the right to family autonomy and privacy, both are subject to the same constitutional protection. *See, e.g., R.S.C. v. J.B.C.,* 812 *So.*2d 361, 369 (Ala.Civ.App.2001) (noting that visitation is essentially form of temporary custody while it is being exercised) (footnote omitted); *Roth, supra,* 789 *A.*2d at 447 n. 13 (remarking that "[v]isitation is 'a limited form of custody during the time the visitation rights are being exercised'" (quoting *In re Marriage of Gayden,* 229 *Cal.App.*3d 1510, 280 *Cal.Rptr.* 862 (1991))). Nevertheless, it would be unrealistic not to distinguish between an award of custody to a third party and grandparent visitation based on the level of intrusion into family life that each entails. The former is obviously a greater invasion of family autonomy and privacy than the latter. It is for that reason that we have declined to adopt the position of our colleague who would

---

[3] *See Watkins, supra,* 163 *N.J.* at 253, 748 *A.*2d 558 ("When the dispute is between two fit parents, the best interest of the child standard controls because both parents are presumed to be equally entitled to custody."). That is also the standard to be applied to a contest between a fit parent and one who has stood in the shoes of the parent to the child (*i.e.* a psychological parent). *See V.C., supra,* 163 *N.J.* at 227–28, 230, 748 *A.*2d 539 ("When there is a conflict over custody and visitation between the legal parent and a psychological parent, the legal paradigm is that of two legal parents and the standard to be applied is the best interests of the child."). Although a grandparent could qualify as a psychological parent if he or she had functioned as a parent, that is not the case here.

require grandparents to prove by clear and convincing evidence the necessity for visitation to avoid harm to the children. *Post* at 122, 827 *A*.2d at 228 (Verniero, J., concurring in part, dissenting in part). We instead approve the preponderance of the evidence burden in the statute as fully protecting the fundamental rights of parents when coupled with the harm standard.

Thus, in every case in which visitation is denied, the grandparents bear the burden of establishing by a preponderance of the evidence that visitation is necessary to avoid harm to the child. The grandparents' evidence can be expert or factual. For example, they may rely on the death of a parent or the breakup of the child's home through divorce or separation. In fact, many of the fifty grandparent visitation statutes specifically recognize the potential for harm when a parent has died or a family breakup has occurred and visitation is denied. In addition, the termination of a long-standing relationship between the grandparents and the child, with expert testimony assessing the effect of those circumstances, could form the basis for a finding of harm. *See, e.g., Roth, supra,* 789 *A*.2d at 445 (noting that proof of substantial, emotional ties between child and nonparent could result in harm to child if contact with that person is denied or curtailed); *Blixt, supra,* 774 *N.E*.2d at 1060 (observing that "[t]he requirement of significant harm presupposes proof of a showing of a significant preexisting relationship between the grandparent and the child"). The possibilities are as varied as the factual scenarios presented.

If the court agrees that the potential for harm has been shown, the presumption in favor of parental decision making will be deemed overcome. At that point, the parent must offer a visitation schedule. If the grandparents are satisfied, that will be the end of the inquiry. If not, a second step will be undertaken— an assessment of the schedule. The presumption in favor of parental decision making having been overcome, the court should approve a schedule that it finds is in the child's best interest, based on the application of the statutory factors. *See N.J.S.A.* 9:2–7.1 (listing statutory factors); *Watkins, supra,* 163 *N.J.* at 254,

748 *A.*2d 558 (noting that once "exceptional circumstances" are found, court should award custody based on child's best interests).

When visitation is not denied outright but the grandparents challenge the sufficiency of the proffered schedule, the same standard will apply. They will be required to prove that visitation is necessary and that the proffered visitation schedule is inadequate to avoid harm to the child. Once those proofs satisfy the court and the presumption in favor of parental decision making is overcome, the court will be required to develop a schedule that is in the child's best interest based on the statutory factors.

 Our resolution results in sustaining the statute by adding a threshold harm standard that is a constitutional necessity because a parent's right to family privacy and autonomy are at issue. All other provisions of the statute remain intact. We note that where necessary to save a statute, "appropriate construction [to] restore [it] to health" is a well-established rule. *First Family Mortgage Corp. v. Durham,* 108 *N.J.* 277, 290, 528 *A.*2d 1288 (1987), *appeal dismissed,* 487 *U.S.* 1211, 108 *S.Ct.* 2860, 101 *L.Ed.*2d 897, *and cert. dismissed,* 487 *U.S.* 1213, 108 *S.Ct.* 2863, 101 *L.Ed.*2d 899 (1988).

## IX

 We turn now to the trial court's findings. Procedurally, the court took pains to recognize *Troxel;* stated that it was giving "great deference to Mr. Moriarty's request by way of visitation"; and determined that the burden of proof was on the grandparents. The court then made findings of fact, addressing each of the statutory factors.

Regarding the relationship between the children and the grandparents, the court observed:

> In this case we have a situation where the children have a very extensive relationship with the grandparents. They spent years where they were seeing the grandparents every other weekend. This is not the usual situation with grandparents, this is a closer relationship. They spent much more time with the grandparents than in many other families. I had in evidence photographs taken by the

grandparents at some of the family outings with the grandchildren which substantiate the testimony of the grandparents as to the many, many activities that took place when they were with the children from basically the children's very early years until the present time.

. . . .

Also, the relationship between the children and the grandparents is significant in a different way because their mother has died recently. Their link to their mother is through their grandparents and through that branch of the family. These children are very aware and were very bonded apparently with their mother and very distressed by her death and very upset by her death.

. . . .

In any event, the children have a relationship, a special relationship with their grandparents, not only because they spent so much time with them in the past and have gone to so many different activities and have learned a lot educationally and have a bond with their cousin, but also because it is through their grandparents that they can reconnect with their mother. Brian in particular indicated in the Family Services report that he hears his mother speaking to him upon occasion. I think the [Moriartys] have made efforts to give treatment and help and counseling to these children. They understand that they suffered a loss. But the grandparents can offer the children a link with their mother, a love for their mother, an understanding of their mother, a sense of being whole with their mother and their mother's side of the family that cannot be obtained elsewhere.

## The court then turned to the relationship between the Moriartys and the grandparents:

There is a very bad relationship between Mr. [Moriarty] and the Bradts. The Family Services report indicates that Mr. [Moriarty] has alienated the children from the grandparents and that he tried to prevent visitation between [the mother] and the children. Mr. [Moriarty], when he testified about his former in-laws, he could not completely contain his hostile emotions. I had to ask him several times to keep his voice down because he raised his voice. When referring to the grandparents he said that they were evil. That he had a Christian household and they were evil. He described them as being alcoholics, drug addicts and murderers. He described the grandfather as consistently hitting the children. He described the grandmother as being an alcoholic, as he also described the grandfather that way. He said that the grandfather had molested [the mother]. There seems to be some indication that [the mother] indicated that she was molested by her grandfather, not the party in this case. But Mr. [Moriarty] testified that it was Jack Bradt who had molested [the mother].

Mr. [Moriarty] blamed the Bradts completely and totally for the problems that their daughter Julie suffered. It was his view that they caused this problem and it was his, Mr. [Moriarty]'s, obligation to protect Brian and Tara from the evil influence of the grandparents. Mr. [Moriarty] has to his credit tried to modify some of these extreme views most of the time when he talks about the situation, but under oath on the stand I think I'm quite accurate in reflecting what his emotional and belief system is towards the grandparents.

> So that through the litigation he talks about the activities that the children have and the fact that the grandparents want to interfere with these activities, but when pressed on the stand he admitted that it wasn't the activities so much as the influence which the grandparents have on the children which is what he is trying to protect them from. And that makes absolute sense to me. It isn't that he is so worried that one of the children might miss hockey practice or might not get to go to a birthday party, it is because he is, in his view and his opinion these grandparents exercise an evil influence on the children. And so with regard to that factor, the relationship between the children's father and the grandparents is a poor relationship and there has been significant hostility. I mentioned the domestic violence restraining order that was granted to the grandmother against the father and there have been other police interaction, some of which were testified to and some of which were not, but were in the papers.

The time that has elapsed since the children last had contact with the applicants was addressed this way:

> This is not a situation where the children have not had contact with the grandparents for a long time. There has been visitation ordered.... [T]here has been contact as recently as October, last month. So there's been a lot of contact recently between grandparents and grandchildren.

The court then turned to the effect that visitation will have on the relationship between the children and the children's parents. Of that, the court stated:

> I don't think visitation will have any effect on the relationship between Tara and Brian and their father and stepmother. By all accounts the [Moriartys] have a very close relationship with Tara and Brian and I cannot see that these children having visitation with their grandparents, whatever the duration, is going to affect the children's relationship with their parents, that is with their father and their stepmother. I do think that the [Moriartys] understand, I hope that they understand, I think that they understand, that denigrating and putting down the grandparents to the children is a very destructive thing to do and I would expect that they would not do that. I know there are allegations back and forth that the adults say negative things about each other, but I would expect them not to do that in front of the children.

With respect to the good faith of the grandparents, the court observed:

> The grandparents here are filing the application in good faith and I think that they have modified their request in good faith because they have testified under oath that they consulted with various professionals about the extent to which they should be involved with their grandchildren's life and again, for whatever reasons but that being one of them, they have withdrawn the requests that they made earlier.
>
> . . . .

However, they are in total good faith in their application and in filing this. They want to spend time and be a part of their grandchildren's lives. They love their grandchildren and they believe that it is in their grandchildren's best interest to have regular extensive contact with their grandparents.

The court also found that there was no history of emotional, physical, or sexual abuse or neglect by the grandparents.

The trial court's most critical findings were as follows:

The other factor that I would put in here would be the death of the mother and the fact that it is extremely important that the children continue a bond with their mother's side of the family. And the experts all agreed on that. Family Services agreed on it and Dr. Judith Brown [Greif] agreed on it, that it was important that there be extensive visitation with the grandparents.

. . . .

Dr. [Greif], who did not interview the parties but she read the Family Services evaluation and took their evaluation to be accurate in terms of what they found, and she indicated that this in her view, and she is very well regarded and very knowledgeable and very experienced in matters of custody evaluations and strained relationships, and she said that if, in fact, as the Family Services found that the [Moriartys] were alienating the children from their grandparents, that that alienation could not be counteracted with a short visit. That it requires the time for the children to be immersed in the environment of the grandparents to get away from the alienation and be able to have a good time with the grandparents without feeling guilty towards the father and their stepmother that they are having a good time with the grandparents.

. . . .

I asked Dr. [Greif] whether any harm would come to the children if visitation was as limited as that requested by Mr. [Moriarty] and what she said is that allowing such limited visitation would allow the alienation by the father and his wife towards the grandparents to succeed. Because let me just say, the reason I asked Dr. [Greif] this is because it seemed to me that certainly the possibility was there that putting these children in between these adults who are so hostile towards each other would be a negative thing for them and maybe it would be just better, since they're with Mr. [Moriarty] who's a fit parent and his wife, to just keep them there and let them have them give up their relationship with the grandparents and at least there would not be so much strife. So I asked Dr. [Greif] what would the harm be of allowing only the limited visitation that Mr. [Moriarty] is requesting. The answer is the harm would be that the alienation would succeed and that the children would believe essentially that half of them, that their mother's half is evil, is damaged, is bad, and that this would cause self-esteem problems for the children since the children know that they're made up of their mother and their father. So if their mother's family is so evil and bad, it means that the children themselves, it would mean to the children, that they themselves are half bad or half evil and that this would be a very destructive thing psychologically for these children.

The court went on to establish the visitation order previously described and stated:

> The reason that I am interfering, if you will, with Mr. [Moriarty]'s desire with regard to this other visit is to protect the children from the harm that would befall them if they were alienated from their grandparents. This trip once every two months for two overnights would allow the children to be in the environment of their grandparents. Allow them to continue to go on outdoors activities. To continue from time to time through the year to meet with their cousin Natalie. To have other family activities with the extended family of their mother. And to know that they are still a full and complete part of that family.

In a sense, the court presaged our opinion by the finding that visitation with the grandparents was necessary to avoid harm to the children. That finding, which was fully supported by the record, overcame the presumption in favor of Moriarty's decision making and allowed the court to fashion carefully a schedule to serve the children's best interests.

## X

The judgment of the Appellate Division is reversed. The order of the trial court is reinstated.

VERNIERO, J., concurring in part, dissenting in part.

I concur in much of the Court's opinion. Specifically, I agree that a fit parent's decision regarding his or her child's visitation with a non-parent can be overridden only by evidence of demonstrable physical or psychological harm to the child. Unlike the majority, however, I believe that the movant must establish such harm by clear and convincing proof, not by a simple preponderance of the evidence. In that respect, I subscribe entirely to the view articulated by the American Civil Liberties Union in its *amicus* brief:

> The existence of demonstrable harm is a fact-intensive inquiry that of course should be performed by the trial court in the first instance. It may well embrace the concept of emotional injury that a child may suffer if a previously established positive relationship with a grandparent or sibling is suddenly severed. But because the court necessarily acts with less than complete knowledge and understanding of all the complex factors that are relevant in making this determination, and because special deference must be afforded to the wishes of the parent, an

additional procedural safeguard is needed to compensate for this inherent limitation in the judicial fact-finding process. A finding that harm exists should be proved not merely by a simple preponderance of the evidence standard, but by the enhanced "clear and convincing evidence" standard that applies when individual constitutional interests are at stake. [*See, e.g.,*] *Santosky v. Kramer,* 455 *U.S.* 745[, 102 *S.Ct.* 1388, 71 *L.Ed.*2d 599] (1982) (requiring clear and convincing evidence of neglect to terminate parental rights); *V.C. v. M.J.B.,* 163 *N.J.* 200, 748 *A.*2d 539[, *cert. denied,* 531 *U.S.* 926, 121 *S.Ct.* 302, 148 *L.Ed.*2d 243] (2000) (requiring clear and convincing evidence of harm to deny psychological parent visitation). *See generally, Anderson v. Liberty Lobby, Inc.,* 477 *U.S.* 242[, 106 *S.Ct.* 2505, 91 *L.Ed.*2d 202] (1986) (requiring clear and convincing evidence in establishing actual malice in libel case); *E.B. v. Verniero,* 119 *F.*3d [1077] (3d Cir.1997) (requiring clear and convincing evidence, rather than mere preponderance of evidence, of probability of reoffense in Megan's Law notification in order to overcome due process and privacy interests of registrant)[, *cert. denied sub nom., W.P. v. Verniero,* 522 *U.S.* 1109, 118 *S.Ct.* 1039, 140 *L.Ed.*2d 105 (1998)].

In allegations of psychological harm, it is often easy, and perhaps too easy, to articulate a colorable claim of such harm and thereby undermine parental judgment. Thus, the "clear and convincing evidence" standard can be of very real assistance in mandating adherence to constitutional norms, particularly in cases such as this, where the "harm" that would allegedly result from curtailing, but not eliminating, visitation between the Bradts and their grandchildren has been colorably articulated, but perhaps not convincingly demonstrated.

The Court appropriately models its approach on the standard articulated in our prior case, *Watkins v. Nelson,* 163 *N.J.* 235, 748 *A.*2d 558 (2000). We were not required in *Watkins* to specify whether a clear and convincing showing of harm would be required in the present setting. We did, however, observe that "the law should not disturb the parent/child relationship except for the strongest reasons and only upon a clear showing of a parent's gross misconduct or unfitness or of other extraordinary circumstances affecting the welfare of the child." *Id.* at 245, 748 *A.*2d 558 (internal quotation marks and citation omitted). I construe that statement as being consistent with our imposing a clear and convincing burden of proof within the context of the current dispute.

I do not wish to prolong this litigation any more than is necessary. Given the fundamental constitutional issues at stake, however, I see no choice but to direct a remand to the trial court for further proceedings. It would be best for the children, of course, if the parties were to resolve their differences amicably

and without further judicial involvement. Absent that resolution, which no longer appears possible, the trial court must intervene. It should do so only after permitting the parties to argue and submit additional evidence, if any, consistent with the elevated burden of proof to which I have adverted. If the movants succeed in satisfying that burden, then the trial court should approve a visitation schedule in the same manner set forth by the majority.

To summarize: I do not condone plaintiff's reaction to the Bradts. As the trial court found, however, there is no allegation that plaintiff is an unfit parent. As a result, plaintiff's decision in respect of visitation should be immune from judicial intervention absent a showing by clear and convincing evidence of harm to the children. Accordingly, I would remand the matter to the trial court to determine whether that standard has been satisfied. Both children are now teenagers and soon will be of age to decide these issues for themselves. The process, however, is best served by the trial court ratifying, modifying, or rescinding its prior decision after it applies what I perceive to be the correct test. In all other respects, I agree with the Court's opinion.

*For reversing and reinstating*—Chief Justice PORITZ and Justices COLEMAN, LONG, LaVECCHIA, ZAZZALI, and ALBIN—6.

*Concurring in part dissenting in part*—Justice VERNIERO—1.